# JOHNSON *v.* GEARLDS.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 802.   Argued May 1, 1914.—Decided June 8, 1914.

Where complainant's entire case rests on the construction of treaties with Indians in regard to reservations and on the claim that certain of such treaties have been repealed by the subsequent admission of the Territory within which the reservations are situated, this court has jurisdiction of a direct appeal from the District Court under § 238, Judicial Code.

The provision in Article VII of the treaty with the Minnesota Chippewa Indians of 1855, that the laws of Congress prohibiting the manufacture and introduction of liquor in Indian country shall be in force within the entire boundaries of the country ceded by that treaty to the United States until otherwise provided by Congress, relates to the outer boundaries and includes all the reservations that lie within.

It is within the constitutional power of Congress to prohibit the manufacture, introduction or sale of intoxicants upon Indian lands, including not only land reserved for their special occupancy, but also lands outside of the reservations to which they may naturally resort; and this prohibition may extend even with respect to lands lying within the bounds of States.

Article VII of the Chippewa treaty of 1855 was not repealed directly or by implication by the subsequent act of Congress admitting Minnesota into the Union, nor was that article repealed by the effect of the subsequent treaties with the same bands of Chippewas of 1865 and 1867; but the intent of treaties of 1855, 1865 and 1867, as construed

together, was that the acts of Congress relating to the introduction and sale of liquor in Indian country should continue in force within the entire boundaries of the country in question until otherwise provided by Congress.

Article VII of the Chippewa Treaty of 1855 has not been superseded by any of the provisions of the Nelson Act of 1889, or the cessions made by the Indians to the United States pursuant thereto; nor has that article been superseded by reason of any change in the character of the Territory affected by the treaty and the status of the Indians therein.

The abrogation of an article in an Indian treaty prohibiting the sale of liquor within territory specified therein until Congress otherwise provides is, in the absence of any considerable number of Indians remaining in that territory, a question primarily for Congress and not for the courts.

The fact that there has been a recent communication and recommendation from the President to Congress on a particular subject and Congress has not acted thereon is evidence that the problem is not so entirely obvious of solution that the courts can declare it to be beyond the range of legislative discretion.

Article VII of the Chippewa Treaty of 1855 having provided for the prohibition against sale of liquor within the entire territory ceded by that treaty until Congress should otherwise provide, *held* that notwithstanding the subsequent admission of Minnesota to the Union, and the later treaties with the Chippewas of 1865 and 1867 and the changed condition of the country and the status of the Indians, Congress not having otherwise provided, the prohibition is still in force throughout that entire territory including the City of Bemidji in which there are but few Indians and in the vicinity of which there is a large area of territory unrestricted by the prohibitions of Article VII.

183 Fed. Rep. 611, reversed.

THIS is a direct appeal from a final decree of the District Court, rendered April 20, 1912, granting to appellees (who were complainants below, and will be so designated), a permanent injunction against appellants (defendants below), in accordance with the prayer of the amended bill of complaint. It appears that complainants are severally residents and citizens of the City of Bemidji, Beltrami County, Minnesota, and at the time of the filing of the

bill were, and for a considerable time had been, engaged
in business there as saloon-keepers, selling at retail spiritu-
ous, vinous and malt liquors at their respective places of
business in that city, each of them having paid to the
Federal and state governments respectively, the necessary
tax and license fees, and having a receipt from the Federal
Government and a liquor license issued under the au-
thority of the State of Minnesota by the municipal council
and officials of the city. The bill alleged that each of the
complainants had refrained from selling or disposing of
any liquor to Indians, or individuals of Indian blood, and
had complied with the Federal and state laws in this and
in other respects; that each of them had built up and es-
tablished a profitable and lucrative trade; and that the
jurisdictional amount was involved. It averred that de-
fendants, being citizens of other States, and acting in
conjunction as special officers under the Interior De-
partment of the United States Government, were threat-
ening to enforce within the City of Bemidji the provisions
of §§ 2139 and 2140 of the Revised Statutes of the United
States and amendments thereto, and on December 9, 1910,
had ordered complainants and other licensed saloon-
keepers in Bemidji to close their saloons and cease sales of
liquor, and ship away their stock, threatening that other-
wise they would destroy the stocks of liquor in the posses-
sion of complainants, on the ground that under Article VII
of a treaty made on the twenty-second day of February,
1855, between the United States and certain bands of
Chippewa Indians, certain territory mentioned in the
treaty, including what is now the City of Bemidji, was
subject to the laws of the United States respecting the
sale of liquors in the Indian country.

To the bill as orginally filed defendants interposed a
demurrer, which was overruled, and a temporary injunc-
tion was granted. 183 Fed. Rep. 611. Thereafter, the
cause was brought to final hearing upon an amended bill

and a reamended answer, and the court, adhering to its former conclusion, rendered a final decree, as already mentioned.

The pertinent historical facts, as deduced from the averments of the amended pleadings, are as follows: On and prior to February 22, 1855, certain bands of the Chippewa Tribe of Indians, known as the Mississippi bands and the Pillager and Lake Winnibigoshish bands, were in possession of the greater portion of the lands north of parallel 46, within the boundaries of the then Territory of Minnesota. Their country constituted a wilderness, almost wholly uninhabited by civilized people. On the date mentioned, these bands entered into a treaty with the United States, which was approved by the Senate and proclaimed by the President shortly thereafter (10 Stat. 1165). By its first article the Indians ceded and conveyed to the United States "all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries:" [Here follows a particular description, by natural boundaries, of a tract of country said to contain about 21,000 square miles.] By the same Article the Indians further relinquished and conveyed to the United States any and all right, title, and interest, of whatsoever nature, that they then had in and to any other lands in the Territory of Minnesota or elsewhere. This Article mentions no exception or reservation from the lands ceded or granted. By Article II there was "reserved and set apart, a sufficient quantity of land for the permanent homes of the said Indians: the lands so reserved and set apart to be in separate tracts, as follows." The separate tracts were then briefly described or indicated. For the Mississippi bands seven reservations were set apart, which came to be known as the Mille Lac, Rabbit Lake, Gull Lake, Pokagomon Lake, Sandy Lake, and Rice Lake reservations; and besides these, a section of land was

reserved for one of the Indian chiefs. For the Pillager and Lake Winnibigoshish bands, three reservations were set apart, known from their respective locations as the Leech Lake, Lake Winnibigoshish, and Cass Lake reservations.

The seventh Article of the treaty is as follows:

"Article VII. The laws which have been or may be enacted by Congress, regulating trade and intercourse with the Indian tribes, to continue and be in force within and upon the several reservations provided for herein; and those portions of said laws which prohibit the introduction, manufacture, use of, and traffic in, ardent spirits, wines, or other liquors, in the Indian country, shall continue and be in force, within the entire boundaries of the country herein ceded to the United States, until otherwise provided by Congress."

By act of February 26, 1857, c. 60, 11 Stat. 166, the inhabitants of a portion of the Territory, including the lands ceded by the Chippewas as above, were authorized to form a state government and come into the Union on an equal footing with the original States. The act contained no condition with reference to the Treaty of 1855 or the rights of the Indians to any lands within the boundaries of the State. A state constitution was formed, by which Indians were given the right to vote under certain circumstances, and persons residing on Indian lands were declared entitled to enjoy the rights and privileges of citizens as though they lived in any other portion of the State, and to be subject to taxation. This constitution having been ratified and adopted by the people, Congress, by act of May 11, 1858, c. 31, 11 Stat. 285, admitted the State "on an equal footing with the original States in all respects whatever." And by § 3 it was enacted that all the laws of the United States, not locally inapplicable, should have the same force and effect within that State as in other States of the Union.

Another treaty was made between the Mississippi, Pillager, and Lake Winnibigoshish bands of Chippewas and the United States under date May 7, 1864, which was ratified and proclaimed in the following year and is known as the Treaty of 1865 (13 Stat. 693). It took the place of a treaty of March 11, 1863 (12 Stat. 1249). By its first section the Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake, Pokagomon Lake, and Rice Lake reservations as described in the Treaty of 1855, were ceded to the United States, with an exception not now pertinent; and in consideration of this cession, the United States agreed to set apart for the future home of the Chippewas of the Mississippi a considerable tract of land (part of the great tract ceded in 1855), embraced within designated boundaries, expressly excepting however the reservations made in the Treaty of 1855 for the Pillager and Lake Winnibigoshish bands, which were included within the boundaries mentioned. The lands thus set apart for the Chippewas of the Mississippi contained all the territory now within the limits of the City of Bemidji and the lands adjacent to it for a distance of several miles in all directions.

By a treaty made between the United States and the Chippewas of the Mississippi dated March 19, 1867, ratified and proclaimed in the same year (16 Stat. 719), these bands ceded to the United States the greater portion (estimated at 2,000,000 acres) of the lands secured to them by the treaty of 1865, and in consideration of this cession, the United States set apart for the use of the same Indians a tract to be located in a square form as nearly as possible, with lines corresponding to the Government surveys, the reservation to include White Earth Lake and Rice Lake, and to contain thirty-six townships. This reservation came to be known as the White Earth Reservation. It lies within the exterior boundaries of the cession of 1855.

The territory ceded to the United States by the treaty

of 1867 contains what is now the City of Bemidji and the country about it for miles in every direction.

By an act of January 14, 1889, known as the Nelson Act, c. 24, 25 Stat. 642, the President was authorized to designate Commissioners to negotiate with all the different bands of Chippewa Indians in Minnesota for the complete cession and relinquishment of their title and interest in all their reservations, except the White Earth and Red Lake Reservations, and in so much of these two reservations as in the judgment of the Commission was not required to make and fill the allotments required by this and existing acts. The act provided that a census should be taken, and that after the cession and relinquishment had been approved, all the Chippewa Indians in the State, except those on the Red Lake Reservation, should be removed to the White Earth Reservation, and lands should then be allotted to the Indians in severalty, in conformity with the act of February 8, 1887, c. 119, 24 Stat. 388, and the surplus lands disposed of by sale, and the proceeds placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, to bear interest payable annually for fifty years, and at the end of that period the fund to be divided and paid to all of said Chippewas, and their issue then living, in cash. By the first section of this act the acceptance and approval of the cession and relinquishment of the lands by the President of the United States was to be deemed full and ample proof of the assent of the Indians, and to operate as a complete extinguishment of the Indian title without further act or ceremony. Commissioners were appointed accordingly, and agreements were entered into between them and the several bands of Chippewas, by which the Indians accepted and ratified the provisions of the act and ceded to the United States all their right, title, and interest in their reservations, excepting portions of

the White Earth and Red Lake Reservations, and these cessions were approved by the President on the fourth day of March, 1890.

Since the making of the Treaty of 1855 the country then ceded to the United States, with the exception of the portions set apart as Indian reservations, has been largely developed, gradually at first, but with great rapidity during recent years, and all the land has become populated by white people and opened up to settlement and organized as political subdivisions of the State, and in the larger portion of the territory industries have been established and commercial interests have grown up, so as to materially change the situation that existed at the time of the making of the treaty. According to the census of 1910, the counties affected by that treaty show a total white population of 382,191. Bemidji is the county seat of Beltrami County, and is a municipal corporation, organized under the laws of the State as a city, containing within its corporate limits about 7,000 inhabitants, and, in connection with adjacent municipalities, constituting a population of about 9,000 people. The city is reached by five lines of railroads, three of which have transcontinental connections. The country surrounding it is highly developed, and there are no Indian habitations within twenty miles in any direction from the city.

The original Red Lake Indian Reservation lay immediately north of the great tract covered by the cession of 1855, and was not subject to the treaty of that year. Pursuant to the Nelson Act of January 14, 1889, a considerable portion of this reservation was relinquished to the United States, and has been opened up to settlement, with the result that there is now a strip of territory about fifteen miles in width, lying a few miles north of Bemidji, which is admittedly exempt from the provisions of any treaty or law relative to the introduction of intoxicating liquors in the Indian country; and in that strip the sale of intoxi-

cating liquors is actually conducted without interference on the part of the Government of the United States.


*Mr. Assistant Attorney General Wallace* for appellants:

This court has jurisdiction under § 238, Judicial Code, because the construction or validity of Article VII of the Treaty of 1855 is drawn in question; the construction or application of the Constitution is involved; the construction of Treaties of 1865 and 1867 is drawn in question. *United States* v. *Wright*, 229 U. S. 226. "Validity" involves existence of treaty. The Minnesota Enabling Act did not expressly repeal Article VII.

The question of implied repeal depends on the relative potency of state police power and the Federal interstate commerce power.

The court below erred in holding that the state police power was dominant.

Article VII of the treaty was in force in 1910.

It was not repealed by the Minnesota Enabling Act.

*Webb Case*, 225 U. S. 663, and *Wright Case*, 229 U. S. 226, control this case.

The *Perrin, Dick*, and *Whisky Cases* are like the case at bar, except that Congress acted here before, and there after, Statehood.

If Congress still had power after Statehood, implied repeal by Enabling Act is not possible.

A reservation of power in Enabling Act is not necessary.

Congress could not reserve a power it might not enjoy without reservation.

The State has no police power over Indian commerce.

The *McBratney* and *Draper Cases* are distinguished in the *Donnelly Case*, and *Ward* v. *Race Horse*, 163 U. S. 504, is distinguished.

The *Friedman Case* was overruled by the Circuit Court of Appeals in 180 Fed. Rep. 1006.

Article VII was not repealed by Treaties of 1865 or 1867, and there has been no express repeal.

It was not necessary to repeat prohibition in 1865 or 1867 because Article VII in the 1855 treaty covered and protected the whole area.

The need for protection of Article VII, was as great in 1865 and 1867 as in 1855.

The rule that reconveyance to a grantor cancels existing covenant is not applicable in this case, because there has been no such reconveyance in fact and because that rule does not apply to treaties.

Article VII had not become a purely arbitrary regulation in 1910.

Three classes of Indians are concerned: full-blood White Earth and all Leech Lake allottees holding prior to act of May 9, 1906. These may be citizens but cannot alienate lands.

All of the above are holding allotments only since the act of 1906. These are not citizens and cannot alienate.

Mixed-blood White Earth allottees are citizens of the United States and of the State.

All save class 3 are still in wardship (without regard to other reasons), because the trust period has not expired.

The wardship of mixed blood White Earth allottees depends on whether they are still regarded as a dependent people by the executive and legislative branches of the Government.

The pleadings do not show that this protection is purely arbitrary as applied to tract A.

The open 15-mile strip never was protected by treaty.

There is present need of 10,000 Indians for this protection, and there is inadequacy of state laws to keep the liquor out.

In support of these contentions, see *Altman & Co.* v. *United States*, 224 U. S. 583; *The Cherokee Tobacco*, 11 Wall. 616; *Champion Lumber Co.* v. *Fisher*, 227 U. S. 445,

451; *Cornell* v. *Green,* 163 U. S. 75; *Couture* v. *United States,* 207 U. S. 581; *Coyle* v. *Oklahoma,* 221 U. S. 559; *Dick* v. *United States,* 208 U. S. 340; *Donnelly* v. *United States,* 228 U. S. 243; *Draper* v. *United States,* 164 U. S. 240, 247; *Ex parte Webb,* 225 U. S. 663; *Foster* v. *Neilson,* 2 Pet. 314; *Friedman* v. *United States Exp. Co.,* 180 Fed. Rep. 1006; *Georgia Rd. &c. Co.* v. *Walker,* 87 Georgia, 204; *Green* v. *Edwards,* 15 Tex. Civ. App. 382; *Holder* v. *Aultman,* 169 U. S. 81; *Hallowell* v. *United States,* 221 U. S. 312; *Jones* v. *Walker,* 2 Paine, 288; *Loeb* v. *Township,* 179 U. S. 472; *Matter of Heff,* 197 U. S. 488; *Matter of Rickert,* 188 U. S. 432; *McKay* v. *Kalyton,* 204 U. S. 458, 466; *Mosier* v. *United States,* 198 Fed. Rep. 54; *Muse* v. *Arlington Hotel Co.,* 168 U. S. 435; *People's Bank* v. *Gibson,* 161 Fed. Rep. 286, 291; *Perrin* v. *United States,* 232 U. S. 478; *Petit* v. *Walshe,* 194 U. S. 216; *Pollard* v. *Hagan,* 3 How. 212; *Silverman* v. *Loomis,* 104 Illinois, 142; *Tiger* v. *Western Invest. Co.,* 221 U. S. 286; *United States* v. *Celestine,* 215 U. S. 287; *United States* v. *Holliday,* 3 Wall. 407; *United States* v. *McBratney,* 104 U. S. 621; *United States* v. *Pelican,* 232 U. S. 442; *United States* v. *Sandoval,* 231 U. S. 28; *United States* v. *Sutton,* 215 U. S. 291; *United States* v. *Wright,* 229 U. S. 226; *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188; *United States Exp. Co.* v. *Friedman,* 191 Fed. Rep. 673; *Ward* v. *Race Horse,* 163 U. S. 504; *Wilson* v. *Shaw,* 204 U. S. 24, 33.

*Mr. Charles P. Spooner,* with whom *Mr. Marshall A. Spooner, Mr. John C. Spooner, Mr. Fred W. Zollman* and *Mr. Joseph P. Cotton,* were on the brief, for appellees:

This court has not jurisdiction of this appeal under § 238, Judicial Code, because the construction or validity of Article VII of the treaty of 1855 is not drawn in question; the construction or application of the Constitution is not involved; the construction of the treaties of 1865 and 1867 is not drawn in question.

Article VII of the treaty of 1855 was repealed by the Minnesota Enabling Act; it was also repealed by the treaties of 1865 and 1867; and it had expired in 1910 because of the act of January 14, 1889, and the change in the character of territory and the status of Indians.

In support of these contentions, see *Bates* v. *Clark*, 95 U. S. 204; *Balt. & Poto. R. R. Co.* v. *Hopkins*, 130 U. S. 210; *Champion Lumber Co.* v. *Fisher*, 227 U. S. 445; *Clough* v. *Curtis*, 134 U. S. 361; *Hamilton* v. *Rathbone*, 175 U. S. 414; *Linford* v. *Ellison*, 155 U. S. 503; *Matter of Heff*, 197 U. S. 488; *McLean* v. *Railroad Co.*, 203 U. S. 38; *Miller* v. *Cornwall R. R. Co.*, 168 U. S. 131; *New Orleans* v. *Water Works Co.*, 142 U. S. 79; *Snow* v. *United States*, 118 U. S. 346; *Swearingen* v. *St. Louis*, 185 U. S. 38; *Tiger* v. *Western Invest. Co.*, 221 U. S. 286; *United States* v. *Celestine*, 215 U. S. 278, 290; *United States* v. *Dick*, 208 U. S. 340; *United States* v. *Fisher*, 2 Cranch, 358; *United States* v. *Forty Gallons of Whiskey*, 93 U. S. 188; *United States* v. *Lynch*, 137 U. S. 280; *United States* v. *Perrin*, 232 U. S. 478; *United States* v. *Sandoval*, 231 U. S. 28; *United States* v. *Wright*, 229 U. S. 226; *Wiggan* v. *Connolly*, 163 U. S. 56.

Mr. Justice Pitney, after making the foregoing statement, delivered the opinion of the court.

This direct appeal is taken under § 238, Jud. Code (act of March 3, 1911, c. 231, 36 Stat. 1087, 1157), which allows such an appeal (*inter alia*) "in any case that involves the construction or application of the Constitution of the United States; in any case in which the constitutionality of any law of the United States, or the validity or construction of any treaty made under its authority is drawn in question." Our jurisdiction is invoked upon three grounds: (a) that the construction or validity of Article VII of the Treaty of 1855 is drawn in question; (b) that the construction or application of the Constitution is

involved; (c) that the construction of the Treaties of 1865 and 1867 is drawn in question. There is a motion to dismiss, based upon the ground that none of these contentions is well founded. We think the motion must be denied. The court below, in overruling the demurrer, based its decision upon the ground that the treaty of 1855 was necessarily repealed by the admission of the State of Minnesota into the Union upon an equal footing with the original States. This decision was based upon the bill as originally framed, but the amendments made no change affecting this ground of decision; and it is evident from the record that in granting the final decree the court adhered to the view expressed in overruling the demurrer. It is insisted by appellants, with some force, that this view was based upon grounds that involved the construction or application of the Constitution of the United States; and that for this reason the direct appeal lies. We find it unnecessary to consider the point, since it seems to us that the entire case for complainants rests at bottom upon grounds that involve the construction of the three treaties referred to, especially that of 1855.

The bill, either in its original or its amended form, did not expressly assert as a ground for relief that the treaty of 1855 had been repealed, in whole or in part, by the admission of the State. On the contrary, relief was prayed upon the ground that the second clause of Article VII (that which related to the liquor traffic and was to remain in force until otherwise provided by Congress) applied only to the ceded territory, and not to the reservations set apart within that territory; that by the Treaty of 1865 those reservations were ceded to the United States, and ceased to be Indian country in any sense; and that by the subsequent cession in the Treaty of 1867 the reservation of 1865 in turn was vested in the United States, and therefore ceased to be Indian country; and, finally, that Article VII of the treaty of 1855 had expired at the time of

the acts complained of in the bill (1910) by virtue of the provisions of the act of January 14, 1889, and the cessions made to the United States by the Chippewas of Minnesota pursuant to that act, and because of the changes wrought by time in the character of the territory included in the Treaty of 1855 and the status of the Indians therein. These grounds of relief are reiterated in the amended bill, and the averments of the amended answer are calculated to meet them. And the principal force of the arguments on both sides is addressed to the construction of the several treaties referred to. For this reason, if for no other, the direct appeal is well taken.

Upon the merits, we may well begin with the disputed portion of the Treaty of 1855:.

"Article VII. The laws which have been or may be enacted by Congress, regulating trade and intercourse with the Indian tribes, to continue and be in force within and upon the several reservations provided for herein; and those portions of said laws which prohibit the introduction, manufacture, use of, and traffic in, ardent spirits, wines, or other liquors, in the Indian country, shall continue and be in force, within the entire boundaries of the country herein ceded to the United States, until otherwise provided by Congress."

The reference to previous laws clearly points to the act of June 30, 1834, entitled "An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers" (c. 161, 4 Stat. 729), and kindred acts. The act of 1834 was a revision of previous enactments, and contains many provisions for the regulation of trade and intercourse. Its twentieth and twenty-first sections (4 Stat. 732) prohibit the introduction or manufacture of, or traffic in, spirituous liquor or wine within the Indian country. From them, §§ 2139, 2140, and 2141, Rev. Stat., were derived.

By the first section of the act of 1834, the term "Indian

country" was defined, for the purposes of that act, as meaning land to which the Indian title had not been extinguished. At the making of the treaty, therefore, the restriction respecting the liquor traffic was in force within the ceded area, because until then the Indian title had not been extinguished. It was the evident purpose of Article VII to continue the restriction in force in the ceded territory, notwithstanding the extinguishment of the Indian title. Such stipulations were not unusual. A contemporaneous treaty with the Winnebagoes contained a similar one. 10 Stat. 1172, 1174, Article VIII. And it has been uniformly recognized that such stipulations amount in effect to an amendment of the statute, so as to make the restriction effective throughout the ceded territory. *United States* v. *Forty-three Gallons of Whiskey*, 93 U. S. 188, 196; *Bates* v. *Clark*, 95 U. S. 204, 208.

The fundamental contention that underlies the entire argument for complainants is that the first part of Article VII had for its object that the laws of Congress, present and future, regulating trade and intercourse with the Indian tribes, were to continue and be in force within the reservations created by the treaty; while the latter portion of the Article had for its object to keep in force in the ceded country—which, it is said, excludes the reservations—those portions of the laws that prohibited the introduction, manufacture, use of, and traffic in ardent spirits, etc., in the Indian country until otherwise provided by Congress; the particular insistence being that the latter clause applies merely to the so-called ceded territory, and not to the lands included within the reservations.

With this construction of the treaty we cannot agree. We think it rests upon a misconception of the fair import of the terms employed in Article VII, whether considered alone or together with the context, and fails to give due effect to the reason and spirit of the stipulation.

It seems to us that in the qualifying clause—"within

the entire boundaries of the country herein ceded to the
United States";—the words "entire boundaries" are
equivalent to "outer boundaries," and therefore include
the reservations that lie within. And this agrees with the
context; for, if we turn back to see what is "herein ceded,"
we find, that by the terms of Article I the cession is of all
the right, title, and interest of the Indians in the lands
owned and claimed by them included within designated
boundaries (this being the great tract in question), and
then, in a separate clause, a relinquishment and convey-
ance of all right, title, and interest of the Indians in any
other lands in the Territory of Minnesota or elsewhere.
There is here no suggestion that the reservations are
excepted out of the cession. On the contrary, Article I
in terms vests the Indian title in the United States as to
all the described lands, including the reservations men-
tioned in Article II. The latter article reserves a number
of comparatively small and isolated tracts "for the per-
manent homes of the said Indians." Of these, all are
within the outer boundaries of the cession excepting the
Mille Lac Reservation, which lies outside. Reading the
two articles together, it is evident that the framers of the
treaty intended that the reservations themselves should
become the property of the United States, subject only
to a trust for the occupancy of the Indians. This is placed
beyond controversy when we observe that by the latter
part of Article II it was provided that the President of the
United States might cause the reservations or portions
thereof to be surveyed; assign a reasonable quantity, not
exceeding eighty acres in any case, to each head of a
family or single person over twenty-one years of age for
his or their separate use; issue patents for the tracts so
assigned, which tracts were to be exempt from taxation,
levy, sale, or forfeiture, and not to be aliened or leased for
a longer period than two years at one time, unless other-
wise provided by the legislature of the State with the

assent of Congress; not to be sold or aliened in fee for a period of five years after the date of patent, and not then without the assent of the President; and that prior to the issue of the patents the President might make rules and regulations respecting the disposition of the lands in case of the death of the allottee, etc.

The subdivision of the reservations, allotments to individual Indians, and the ultimate alienation of allotments, being thus in view at the making of the treaty, it is unreasonable to give such a construction to the stipulation contained in the second portion of Article VII as would defeat its object, by removing the restriction from scattered parcels of land whenever it should come to pass that the Indian title therein was extinguished. The restriction would be of little force unless it covered the entire ceded area *en bloc*, so that no change in the situation of the reservations by way of extinguishing the residue of Indian title or otherwise should operate to limit its effect. And so, upon the whole, we deem it manifest that the second clause of Article VII dealt with the entire ceded country, including the reservations, as country proper to be subjected to the laws relating to the introduction, etc., of liquor into the Indian country until otherwise provided by Congress. It was evidently contemplated that the bands of Indians, while making their permanent homes within the reservations, would be at liberty to roam and to hunt throughout the entire country, as before. The purpose was to guard them from all temptation to use intoxicating liquors.

That it is within the constitutional power of Congress to prohibit the manufacture, introduction, or sale of intoxicants upon Indian lands, including not only lands reserved for their special occupancy, but also lands outside of the reservations to which they may naturally resort; and that this may be done even with respect to lands lying within the bounds of a State, are propositions so

thoroughly established, and upon grounds so recently
discussed, that we need merely cite the cases. *Perrin* v.
*United States,* 232 U. S. 478, 483; *United States* v. *Forty-
three Gallons of Whiskey,* 93 U. S. 188, 195, 197; *Dick* v.
*United States,* 208 U. S. 340.

And we cannot agree with the District Court that
Article VII of the treaty of 1855 was repealed by the
Minnesota Enabling Act, or by the admission of that
State into the Union upon equal terms with the other
States. Neither the Enabling Act nor the Act of Admis-
sion contains any reference to the treaty, although the
latter was so recent that it can hardly have been over-
looked. The court seems to have considered that the
continued existence of Article VII, so far as it prohibited
the introduction, manufacture, and sale of liquors within
the ceded country outside of the reservations, was incon-
sistent with the "equal footing" clause of the Enabling
and Admitting Acts. That there is no such inconsist-
ency results very plainly, as we think, from the reason-
ing and authority of the cases above cited. The court
deemed that *United States* v. *Forty-three Gallons of Whiskey,*
*supra,* and *Dick* v. *United States, supra,* were distinguish-
able upon the ground that in each of those cases the
treaty under consideration was made after the State had
been admitted into the Union. But if the making of such
a treaty after the admission of the State is not inconsistent
with the "equal footing" of that State with the others—
as, of course, it is not—it seems to us to result that there
is nothing in the effect of "equal footing" clauses to oper-
ate as an implied repeal of such a treaty when previously
established.

In *Ex parte Webb,* 225 U. S. 663, we had to deal with
the effect of the Oklahoma Enabling Act (June 16, 1906,
c. 3335, 34 Stat. 267) upon a previous statute (act of
March 1, 1895, c. 145, § 8, 28 Stat. 693, 697), which pro-
hibited (*inter alia*), the "carrying into said [Indian] Terri-

tory any of such liquors or drinks," in view of the fact that the Enabling Act itself required that the constitution of the new State should prohibit the manufacture, sale, or otherwise furnishing of intoxicating liquors within that part of the State formerly known as the Indian Territory; and we held that in view of the existing treaties between the United States and the Five Civilized Tribes, and because the Enabling Act and the constitution established thereunder dealt only with the prohibition of the liquor traffic within the bounds of the new State, the act of 1895 remained in force so far as pertained to the carrying of liquor from without the new State into that part of it which was the Indian Territory.

In *United States* v. *Wright*, 229 U. S. 226, we held that the prohibition against the introduction of intoxicating liquors into the Indian country found in § 2139, Rev. Stat., as amended by the acts of July 23, 1892, c. 234, 27 Stat. 260, and January 30, 1897, c. 109, 29 Stat. 506, was not repealed, with respect to intrastate transactions, by the Oklahoma Enabling Act, in spite of the provision respecting internal prohibition contained therein as already mentioned.

Upon the whole, we have no difficulty in concluding that Article VII of the Treaty of February 22, 1855, was not repealed by the admission of Minnesota into the Union.

We come, therefore, to the principal contention of complainants and appellees, which is that the Article was repealed by the effect of the Treaties of 1865 and 1867. The argument in support of this contention may be outlined as follows: that by the earliest of the three treaties the several bands of Indians ceded to the United States the great tract of approximately 21,000 square miles, but excepted from that cession the several reservations created for the Mississippi bands and for the Pillager and Lake Winnibigoshish bands; that when the Treaty of 1865 was

made the Mississippi bands were the owners of their reservations within the exterior limits of the cession of 1855, which reservations were not covered by the second portion of Article VII, but were subject to all of the laws of the United States regulating commerce and intercourse with the Indian tribes, simply because of being Indian country in fact; that by the Treaty of 1865 the Mississippi bands ceded outright to the United States these reservations, and in return the United States ceded to them the tract of territory already mentioned (including Bemidji and the country surrounding it), excepting those portions included within the reservations of the Pillager and Lake Winnibigoshish bands; and that when, in 1867, in return for the White Earth reservation, the Mississippi Chippewas receded to the United States the greater portion of the tract set apart for them in 1865, they ceded the same title and the same right and power over the lands that the three original tribes would have had; that is to say, they ceded them free and clear of Article VII of the Treaty of 1855.

It will at once be observed that the argument rests at bottom upon the erroneous construction to which we have already called attention, viz., that the second portion of Article VII did not apply to the reservations that were within the exterior limits of the ceded territory. We repeat that, in our opinion, the restriction applied to all the territory that was included within the terms of the cession; as much to those portions set apart for reservations as to the surrounding territory. There was nothing in the Treaty of 1865, therefore, to make the receded reservations unrestricted territory; nor was there anything in the Treaty of 1867 to remove the restriction from the territory then receded. Reading the series of treaties together, it is plain enough, we think, that the contracting parties, in all that was done, were resting upon the plain language of the second part of Article VII, which declared that the laws relat-

ing to the introduction, etc., of liquor in the Indian country should continue in force within the entire boundaries of the country in question until otherwise provided by Congress.

Finally, it is contended that Article VII of the Treaty of 1855 had been superseded at the time of the acts complained of in the bill (1910), by virtue of the provisions of the Nelson Act of January 14, 1889, c. 24, 25 Stat. 642, and the cessions made to the United States by the Indians pursuant to that act, and by reason of the change in the character of the territory included in the Treaty of 1855 and the status of the Indians therein.

As already pointed out, this act provided that Commissioners to be appointed by the President should negotiate with the different bands of Chippewas in the State of Minnesota for the complete cession and relinquishment of their title and interest in all their reservations in the State. except so much of the White Earth and Red Lake reservations as was not required for allotments, and that acceptance and approval of such cession and relinquishment by the President should be deemed full and ample proof of the cession and should operate as a complete extinguishment of the Indian title without other or further act or ceremony.

From the averments of the amended bill and answer it is not easy to gather a precise statement of the present situation of the Indian lands and of the Indians themselves, so far as it affects the question before us. Some reference is made to the situation at the Red Lake reservation; but since it is not clear that the restriction contained in the Treaty of 1855 was intended for the protection of the Indians within that reservation, we prefer to confine our attention to the situation as it existed in 1910 within the boundaries of the great tract that was the subject of the cession of 1855. Within those bounds there would seem to be remaining only fragments of the White Earth

and Leech Lake reservations; both reservations being in process of allotment under the acts of February 8, 1887, c. 119, 24 Stat. 388, and of January 14, 1889, c. 24, 25 Stat. 642, and amendatory acts. Of the lands that have been allotted, a considerable portion are still held in fee by the United States, and are non-alienable by the allottees until the expiration of the trust period. Upon the White Earth reservation, and also at Leech Lake, the Government maintains an Indian Agency and Superintendent, as well as Indian schools. At the White Earth Agency, 5,600 Indians are carried upon the annuity rolls; at Leech Lake, 1,750 Indians. The majority of these reside upon lands embraced within the original reservation, and they are the same Indians, or descendants of the same, that were parties to the treaties of 1855, 1865, and 1867. In consequence of their elevation to the plane of citizenship by the operation of the allottment acts, tribal relations have for most purposes ceased to exist, but are recognized for the purpose of the distribution of annuities under the Nelson Act. And it is admitted that for purposes of business, pleasure, hunting, travel, and other diversions, these Indians traverse parts of the region comprised in the cession of 1855, outside of the reservations, and thus visit the towns, villages, and cities in the territory, including Bemidji. On the other hand it is admitted that their visits to Bemidji are infrequent, and that there are no Indian habitations within a range of twenty miles in any direction from that city. And, as pointed out in the prefatory statement, the diminished Red Lake reservation is admittedly surrounded by a strip of land, approximately fifteen miles in width, which never was subject to the Treaty of 1855, and upon which saloons are maintained in close proximity to that reservation. This strip extends along the northerly boundary of the cession of 1855, which is perhaps ten or twelve miles north of Bemidji.

The argument for treating the restriction of 1855 as no

longer in force rests not upon any denial of the fact that there are some thousands of Indians at the White Earth and Leech Lake agencies, who are still more or less under the guardianship of the Government, and for whose protection the liquor restriction ought to be maintained, but rather upon the fact that these Indians are surrounded by territory in which liquor is lawfully obtainable. In support of this, it is said that the former Mississippi reservations ceded to the United States in 1865 are unrestricted territory; that so much of the Leech Lake and Lake Winnibigoshish reservations as were conveyed to the United States in 1890 are such territory; that every allotment from either of these reservations as to which the trust period has expired is such territory, and that lands sold to white men in the reservations is such territory. It will be observed, again, that each of these contentions rests upon the fundamental error that the reservations mentioned in the Treaty of 1855 are not within the liquor restriction of Article VII.

In view of the interpretation we have placed upon that Article, it seems to us that the contention as to changed conditions must be based not upon the supposed fact that the tract covered by the cession of 1855 "is already dotted with wet territory," but rather upon the question whether the restriction—entered into more than half a century ago, when the country was a wilderness—ought to be treated as still in force, in view of the small number of Indians entitled to protection as compared with the large population of whites who now form the great majority of the inhabitants, and in view of the high state of civilization and development of the territory in question.

In *Perrin* v. *United States*, 232 U. S. 478, 486, we had to deal with a somewhat similar question. That was a review of a conviction for unlawfully selling intoxicating liquors upon ceded lands formerly included in the Yank-

ton Sioux Indian reservation in the State of South Dakota. The reservation was created in 1858, and originally embraced 400,000 acres. A considerable part of it was allotted in severalty to members of the tribe under the act of 1887, the allotments being in small tracts scattered through the reservation. By an agreement ratified and confirmed by Congress August 15, 1894 (c. 290, 28 Stat. 286, 314, 318), the tribe ceded and relinquished to the United States all the unallotted lands, and by Article 17 of the agreement it was stipulated: "No intoxicating liquors nor other intoxicants shall ever be sold or given away upon any of the lands by this agreement ceded and sold to the United States, nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, dated April 19th, 1858, and as afterwards surveyed and set off to the said Indians. The penalty for the violation of this provision shall be such as Congress may prescribe in the act ratifying this agreement." In the ratifying act a penalty was prescribed. The ceded lands were opened to disposition under the homestead and town site laws and passed largely into private ownership, and the place at which the intoxicating liquors were sold was within the defendant's own premises in a town located upon a part of the ceded lands held in private ownership by the inhabitants, none of whom was an Indian. After overruling the contention that the restriction was invalid because the power to regulate the sale of intoxicating liquors upon all ceded lands rested exclusively in the State (citing *United States* v. *Forty-three Gallons of Whiskey*, 93 U. S. 188, and *Dick* v. *United States*, 208 U. S. 340), the opinion dealt with the further contention that the power of Congress was necessarily limited to what was reasonably essential to the protection of Indians occupying the unceded lands, and that this limitation was transcended by the provision in

OCTOBER TERM, 1913.

question because it embraced territory greatly in excess of what the situation required, and because its operation was not confined to a designated period reasonable in duration, but apparently was intended to be perpetual. As to this the court said (p. 486):

"As the power is incident only to the presence of the Indians and their status as wards of the Government, it must be conceded that it does not go beyond what is reasonably essential to their protection, and that, to be effective, its exercise must not be purely arbitrary, but founded upon some reasonable basis. Thus, a prohibition like that now before us, if covering an entire State when there were only a few Indian wards in a single county, undoubtedly would be condemned as arbitrary. And a prohibition valid in the beginning doubtless would become inoperative when in regular course the Indians affected were completely emancipated from Federal guardianship and control. A different view in either case would involve an unjustifiable encroachment upon a power obviously residing in the State. On the other hand, it must also be conceded that, in determining what is reasonably essential to the protection of the Indians, Congress is invested with a wide discretion, and its action, unless purely arbitrary, must be accepted and given full effect by the courts."

Although the circumstances of the present case are different, and we are here dealing with a question of obsolescence rather than of original invalidity, the language just quoted indicates the point of view from which the question should be approached. But we must not forget that the question is one, primarily, for the consideration of the law-making body; nor are we in danger of doing so, since by the very terms of the stipulation now under consideration the prohibition of the liquor traffic was to continue "until otherwise provided by Congress." We do not mean to say that if it appeared that no considerable

number of Indians remained wards of the Government within the territory in question, the courts would not be justified in declaring that since the constitutional warrant for the restriction no longer existed the restriction must expire with it. But where the question confessedly turns not upon a total, nor even upon an approximately complete, emancipation of the Indians from the Federal guardianship, but upon their unimportance as compared with the interests of the population at large, we think the question is legislative rather than judicial.

Indeed, it has only recently been under consideration by Congress. On February 17, 1911 (Senate Doc. No. 824, 61st Cong., 3d Sess., Vol. 85), the President, in a special message, called attention to the situation in Minnesota, resulting from the operation of the old Indian treaties under present conditions; and with respect to the area ceded by the Chippewas in 1855, he stated: "The records of the Indian Bureau show that there are within said area, under the jurisdiction of the superintendents of the White Earth and Leech Lake Reservations, 7,196 Indians who can be amply protected by limiting the territory as to which said treaty provisions shall remain in force and effect to the area within and contiguous to said reservations, particularly described as follows: . . . I therefore recommend that Congress modify the article of said treaty quoted above so as to exclude from the operations of its provisions all of the territory ceded by said treaty to the United States, except that immediately above described."

That Congress has not yet acted upon this recommendation is evidence that the problem is not so entirely obvious of solution that it can be judicially declared to be beyond the range of legislative discretion.

Since it must be admitted that complainants have no ground of relief against defendants if the restriction remains in force at Bemidji, as we hold that it does, it follows

that the decree of the District Court should be reversed, and the cause remanded with directions to dismiss the bill.

*Decree reversed.*

MR. JUSTICE McKENNA and MR. JUSTICE LURTON dissent upon grounds expressed in the opinion of the District Court, reported in 183 Fed. Rep. 611.