The **PILLAGER BANDS OF CHIPPEWA INDIANS IN the STATE OF MINNESOTA**

v.

The **UNITED STATES.**
**Appeal No. 5–69.**

United States Court of Claims.
July 15, 1970.

Robert C. Bell, Jr., New York City, attorney of record, for appellants.

Craig A. Decker, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for appellee.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

DAVIS, Judge.

In the mid-1840's the United States embarked on a program of acquiring Indian lands in the Western Great Lakes region. During the next decade several treaties were made with different tribes which ceded their lands in return for varying considerations, including cash, goods, and resettlement on newly established reservations.[1] Among the most desirable tracts was an area in Wisconsin inhabited by the Menominee Tribe. As a step in gaining possession of that land, the United States agreed with the Pillager Band of Minnesota Chippewas—the Treaty of August 21, 1847, 9 Stat. 908, involved here—to purchase some 700,000 acres in Minnesota from the Pillagers, upon which the Government hoped to relocate the Menominees in exchange for the latter's Wisconsin tract. The Pillagers, inveterate foes of the Sioux who lived next to the 700,000 acres in question, agreed "to sell and cede" that land, designated as "Royce 269."[2] The consideration paid the Pillagers, the claimant-appellants, consisted of a supply of dry goods valued at approximately $19,000, and an unwritten promise to settle the Menominees, their allies, on the land, to serve as a buffer between them and the Sioux. The treaty, signed August 21, 1847 and effective April 7, 1848, was extremely brief, noting the friendship between the parties, the location of the land sold and ceded, and the consideration given. Article III, which forms the basis of appellants' suit, stipulated that

> the country hereby ceded shall be held by the United States as Indian land, until otherwise ordered by the President.

A few months later in 1848, the United States sold Royce 269 to the Menominees in return for their Wisconsin property. Treaty of October 18, 1848, 9 Stat. 952. However, upon reconsideration, that tribe decided against abandoning its Wisconsin woodlands, and refused to accept the October 1848

---

1. See, Treaty of October 13, 1846, 9 Stat. 878, with the Winnebagoes; Treaty of August 2, 1847, 9 Stat. 904, with the Mississippi Band of Chippewas; Treaty of August 21, 1847, 9 Stat. 908, with the Pillager Band of Chippewas (the treaty at issue here); and Treaty of October 18, 1848, 9 Stat. 952, with the Menominee Band of Wisconsin.

2. The "Royce" designation comes, of course, "[f]rom Royce's maps in the 18th Annual Report of the Bureau of American Ethnology (part 2), Indian Land Cessions (1896–1897)." Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 908 n. 3, 161 Ct.Cl. 258, 261, n. 3 (1963).

agreement. Surrendering hope of successfully enforcing the compact's terms, the United States, in 1854, reacquired Royce 269 from the Menominees for $262,000 as well as acreage in the Wisconsin forest area on which the Menominees have since lived. Treaty of May 12, 1854, 10 Stat. 1064. Thus, the original plan to interpose the Menominees between the Sioux and the Pillagers was never carried out. The need for this buffer, moreover, soon evaporated. In 1851 the Sioux ceded to the Federal Government all their lands bordering or near to the tract on which the Menominees were to settle. Treaties of July 23 and August 5, 1851, 10 Stat. 949, 954. And in 1855, several Chippewa bands, including the Pillagers, gave up approximately 11,000,000 acres to the United States, and renounced all interest, title, and claim to any lands previously held in Minnesota. Treaty of February 22, 1855, 10 Stat. 1165. The Pillagers agreed to relocate on a reservation many miles from Royce 269.

In 1864, Royce 269 was opened to white settlers, and it has become a thriving part of the State of Minnesota. In that connection, during the late nineteenth century and the early 1900's, the Department of the Interior became concerned about this area over the subject of liquor. Under some Indian treaties involving Minnesota land, the United States had stipulated that liquor would not be sold on the ceded land. The 1847 Pillager treaty did not contain that express agreement, but it did say that Royce 269 was to be held "as Indian land"; under federal law, liquor could not be introduced into Indian country. Because of these apparent restrictions, controversy erupted over the right to sell spirits in that part of Minnesota. See Johnson v. Gearlds, 234 U.S. 422, 34 S.Ct. 794, 58 L.Ed. 1383 (1914). To remove these limitations as far as he could, President Taft, at the suggestion of the Interior Department, issued several Executive Orders in February 1911. Among them was a directive declaring that Royce 269 "shall no longer be held by the United States as Indian land."

Sometime after the Menominees refused to move to Royce 269, and the Federal Government paid them (in 1854) over $262,000 plus good Wisconsin land for that tract, the Pillagers (who had received, in 1848, only $19,000 and the implied promise of friendly neighbors) began to complain that they had been short-changed. These protests were repeated periodically, without much success, until in 1931 a special jurisdictional act allowed them to file suit in this court. Act of March 3, 1931, 46 Stat. 1487. That action was never concluded, however, and after the passage of the Indian Claims Commission Act the present claim was filed under that general statute. The theory is that the Government paid less than fair value for Area 269 and the claimants are now entitled under the Indian Claims Commission Act to a fair-value measure of compensation.

The issue of value has come to the fore because the Commission granted the appellants' motion for summary judgment, concluding "as a matter of law that the Pillager Band of Chippewa Indians was the owner by recognized title of the land (Royce Area 269) ceded by it to the United States by the Treaty of August 21, 1847." The case was ordered to "proceed [in the Commission] to a determination of the acreage and fair market value of Royce Area as of April 7, 1848"—the 1847 treaty's proclamation date, which the Commission held to be "the date of taking of the lands involved"—"and also to a determination of the value of the consideration given by defendant for the cession." See 19 Ind.Cl.Comm. 500 (1968).

The case is not before us on the tribes' entitlement to recover, but solely on the proper date of the "taking". After the Commission's ruling on their motion for summary judgment, the Pillagers submitted a motion for partial reconsideration, alleging that the cession in 1847 was "conditional", subject to Article III

of the Treaty which provided that Royce 269 would be Indian land "until otherwise ordered by the President." The argument was that, as a result of this clause, the Government held the land in trust for the Pillagers until 1911, when President Taft abrogated the "Indian lands" status of the territory; at that time, and not in 1848, the United States gained absolute title; accordingly, compensation should be measured according to the fair market value of the land as of 1911. On the Commission's denial of this motion, 21 Ind.Cl.Comm. 1 (1969), the Indians took an interlocutory appeal to this court. See 25 U.S.C. § 70s(b).

## I.

Even if appellants were right in claiming that Article III of the 1847 Treaty put Royce 269 in trust for them, it would not follow that 1911 would be the proper date of valuation. The rule under the Indian Claims Commission Act is that the compensation for a "taking" by the United States is determined by the fair market value of the land no later than the date the Government actually takes over possession or exerts dominion. This is so whether the acquisition is by eminent domain; wrongful appropriation *in invitum*; a coerced, unfair, or invalid agreement; or a sale for a unconscionably low consideration. Whether the "taking" be constitutional (in the sense of a Fifth Amendment taking) or simply statutory (in the sense of the non-constitutional "takings" for which the Claims Commission Act allows recovery), the latest time for measurement of value is when the Federal Government ousts the Indians under claim of right, gets possession of the land, or otherwise asserts dominion. This is the principle which has consistently been followed.

In Sac and Fox Tribe v. United States, 315 F.2d 896, 901, 161 Ct.Cl. 189, 199, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963), we said in answer to a claim that, since an 1804 cession treaty was said to be invalid, the ceded land "would not have been acquired by the United States in 1804 but only at a later time (under post-1804 treaties or when actually disposed of to settlers) and would therefore have to be valued as of that subsequent date":

* * * If the treaty were invalid, the United States would have unilaterally deprived the Sac and Fox of their lands in 1804, not later; that would be the date of definitive taking, for there could have been little doubt in the minds of the Indians that the United States was continually asserting full ownership of the area after the Treaty. [Footnote omitted.] * * * The proper valuation date would, as we have said, be the date of deprivation, November 1804. It follows that, whether or not the Treaty was validly negotiated, the taking or acquisition by the United States, and the loss by the Indians, occurred in that year. It makes no difference to this proceeding whether the Treaty was invalid at its inception or whether it is now revised (under the Claims Commission Act) on the grounds of unconscionable consideration. In either event the lands found to have been held by the Sac and Fox are to be valued as of 1804, and not thereafter.

Later, in Sac and Fox Tribes v. United States, 383 F.2d 991, 179 Ct.Cl. 8, cert. denied, Iowa Tribe of Iowa Reservation in Okl., 389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967), we noted that the measure of recovery for the sale of Indian land to the United States at an unconscionably low price must be based upon "the fair market value of the lands at the date of acquisition" by the Government, 383 F.2d at 1001, 179 Ct.Cl. at 27. To the same effect is Nooksack Tribe of Indians v. United States, 162 Ct. Cl. 712, 715 (1963), cert. denied, 375 U.S. 993, 84 S.Ct. 633, 11 L.Ed.2d 479 (1964); those Indians argued that, since they were not parties to the treaty involved, their rights remained unimpaired and there was no taking of their lands until much later when whites came into the area as homesteaders; the court ruled, however, that, since the Government always regarded the lands ceded by

the treaty (which included the claimant's property) as public land disposable by the United States, the effective date of the treaty was the proper date of "taking". See, also, Sac and Fox Tribe v. United States, 383 F.2d 991, 1001–1002, 179 Ct.Cl. 8, 27–29, cert. denied, Iowa Tribe of Iowa Reservation in Okl., 389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967); and United States v. Northern Paiute Nation, 393 F.2d 786, 183 Ct.Cl. 321 (1968).

■ Long before 1911, the Federal Government had asserted and exerted full dominion over Royce 269. As early as October 1848, some six months after the Pillagers' cession of the area to the United States, the Government ceded the land outright to the Menominees (Treaty of October 18, 1848, 9 Stat. 952), an act appellants concede was within the Goverment's authority. Subsequent transactions showing effective dominion over the tract by the United States include its reacquisition of the territory from the Menominees in 1854 (Treaty of May 12, 1854, 10 Stat. 1064), the renunciation by the Chippewa Indians, including the Pillagers, of all interest to land in Minnesota in 1855 (Treaty of February 22, 1855, 10 Stat. 1165), and the opening of Royce 269 to white settlers under the Homestead Act in 1864. It is undeniable that the United States exercised full sovereign rights over the land in question, inconsistent with the Pillagers' claim of a continuing interest, much before President Taft's executive order of 1911. The "taking" for which compensation is now asked must therefore have occurred at least several decades before the late date appellants select for measuring fair value.

It is not unjust to appellants to reject 1911. As we have already indicated, the executive order in February of that year had no connection whatever with any of the true concerns of this lawsuit. The order was issued (along with others) solely and merely to make it clear that

liquor could be sold in a part of Minnesota long treated as an integral and non-Indian part of that state. No one was thinking, when the order was issued, of ending a "trust" held by appellants or of "taking" their property; indeed, it is obvious that no one was thinking of the Pillagers at all. If appellants could invoke that executive order for valuation purposes, it would be the sheerest type of unanticipated good fortune, a legal windfall.

## II.

■ Having decided in Part I, *supra*, that appellants' date of 1911 cannot be accepted, we must now consider whether the Commission was correct in choosing April 1848, the effective date of the Pillager treaty, rather than some later time (*e. g.*, 1854, or 1855, or 1864). If the compact gave full and outright title to Area 269 to the United States, without creating any continuing trust for the Pillagers, it would be clear that the Commission's selection is right. Appellants' demand for a later cut-off date is, and can be, based only on the point that Article III established some sort of trust. Since the validity of that "trust issue" can be dispositive of the entire appeal, we first concentrate on it (as did the Commission below).

Putting Article III aside, the terms of the Treaty (9 Stat. 908) undoubtedly point to an outright cession without any continuing interest in the Indians. Article II provides: "The Pillager band of Chippewa Indians *hereby sell and cede* to the United States all the country within the following boundaries * * *" (emphasis added). Article IV says that "[i]n consideration of the *foregoing cession*, the United States agree to furnish to the Pillager band" specified articles (emphasis added). Even Article III[3] refers to the "country *hereby ceded*" (emphasis added) as if the entire interest in the land was passing at that time to the Federal Government. As for the

---

3. "It is stipulated that the country hereby ceded shall be held by the United States as Indian land, until otherwise ordered by the President."

effect of Article III, assuming that the aim of the agreement to hold the area "as Indian land" was to assure the Pillagers of friendly Indian neighbors, this would normally on its face be a contractual understanding or undertaking, forming part of the consideration paid to the tribe, not the implicit creation of a trust by which the Pillagers continued to have an interest in land which they would not thereafter use or occupy. It would be unusual for a tribe to have a trust interest in a region to be inhabited by other Indians.

The only contemporaneous documentation now available consists of the guidance to the federal treaty commissioners, and their transmittal of the treaty to Washington. The instructions called for a "purchase", and referred to a treaty "ceding" the desired land. The transmittal also referred to "purchase" and the "lands purchased". See 21 Ind.Cl. Comm. 1, 8–9 (findings 13–14). Neither set of papers indicates any sort of trust or continuing interest on the part of the Pillagers. This contemporaneous history is thus more consistent with an outright cession than with the special trust appellants claim. The same is true of the Pillagers' relinquishment of their Minnesota lands in 1855, including Royce 269, without any claim as to 269 even though it was then known that the Menominees would not settle in the area.

Appellants lean most heavily on a statement made in 1889 by Henry Rice, the sole surviving government negotiator of the 1847 Treaty, in an address to the Pillagers.[4] In response to a plea from the tribe for justice with respect to area 269 which was asserted to have only been "borrowed" by the United States, Mr. Rice characterized the tract as "the land that you loaned your Great Father forty-two years ago * * *." H.R.Ex.Doc. 247, 51st Cong., 1st Sess., pp. 124–25, March 6, 1890. But earlier, in 1880, the same Mr. Rice had stated in a letter to a chief of the Pillagers: "The sale [of Royce 269] was positive. The Pillagers

have no legal claim to the land, but morally have a claim upon the Government, which claim I hope may at some suitable time be acknowledged by giving to this poor band such aid as will improve its condition." This same letter said:

> In 1847 when the Pillager Indians by treaty *sold to the United States* [Royce 269] for a nominal consideration, it was understood that the country *ceded* had been selected for the future residence of the Menominee Indians who were friendly to the Chippewas, and the country would remain Indian territory (emphasis added).

From appellants' standpoint, there is, at best, a sharp conflict in Rice's post-Treaty appraisal of the Treaty's effect, and we would not be justified in elevating his single 1889 comment ("the land that you loaned") over his contrary 1880 statement, the words of the Treaty, the evidence contemporary with the Treaty, and the Pillagers' own conduct at a time much closer to the Treaty than the 1880's. As a whole, the history and the Treaty terms fit considerably better with the interpretation that (a) the agreement embodied a mutual intent to dispose of title, with the understanding (as part of the consideration) that the Menominees would settle in the ceded area; and (b) a not-surprising complaint by the Pillagers of unfair failure of consideration after the Menominees refused to come over but were nevertheless paid much more handsomely for the area than the Pillagers had received a few years before. The basis for implying a trust is far too slight, even though we read the Treaty liberally in favor of the Indians, as we must. *Cf.* Chippewa Indians of Minnesota v. United States, 307 U.S. 1, 5, 59 S.Ct. 687, 83 L.Ed. 1067 (1939); United States v. Choctaw Nation and Chickasaw Nation, 179 U.S. 494, 535–536, 21 S.Ct. 149, 45 L.Ed. 291 (1900); Sac and Fox Tribe v. United States, 383 F.2d 991, 1001, 179 Ct.Cl. 8, 27, cert. denied, Iowa Tribe of Iowa Reservation in Okl.,

4. Mr. Rice was not a lawyer.

389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967).

We see United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938)—on which appellants rely—as markedly dissimilar. That treaty for the cession of Indian property contained a clause reserving a portion of the land sold which would "until otherwise ordered by the President * * * be set part as a residence for said Indians. * * *" Treaty of October 14, 1864, 16 Stat. 707, 708. We can assume for present purposes that the Supreme Court upheld the Indians' contention that this provision created a trust in their behalf (see California & Oregon Land Co. v. Rankin, 87 F. 532 (C.C. D.Ore.1898)), requiring the United States to reimburse them for any taking of the trust property. The Court held that the plaintiffs were entitled to the fair market value of the property taken as of the date the United States acquired possession, including interest. Unlike the Klamath treaty, however, the Pillagers' compact did not reserve for *them* any portion of the land ceded and, as to 269, they were not thrown out of their land. As we know, one major purpose of the Government in obtaining Royce 269 was to exchange it for land owned by the Menominees, so that the latter would occupy 269. That, for this reason, the territory was to remain "Indian land" does not indicate a retention of any type of proprietary interest by the Pillagers whose concern would simply be in the character of the people living near them. Appellants rightly concede that the Government could vest title in the Menominees without permission from the Pillagers and without liability to them. A concern with who lives next door is very different from an interest in not being dispossessed from one's own land.

There may well have been a failure of consideration when the Menominee transfer failed, and the Pillagers may well have suffered unfair treatment insofar as they agreed to accept the sum of $19,000 because they expected the further advantage of having the Menomi-

nees as neighbors. But as the Commission said below: " * * * if the [appellants] did in fact agree to accept an unconscionably low consideration because of a desire to have friendly Menominees on the lands, they will now receive the full fair market value for the lands ceded (less the payments actually made by defendant). Thereby the plaintiffs will be fully compensated for any overreaching which they may feel occurred at the treaty negotiations." 21 Ind.Cl.Comm. 1, 5. They will, in short, receive as a result of this proceeding the amount to which they would have been entitled in 1848 if the settlement of the Menominees had never been a factor but the Government had simply wished to obtain for itself the land of Area 269.

For these reasons, we hold that the Commission correctly chose April 7 1848, as the valuation date and, insofar as appealed from, we uphold its order on the motion for summary judgment and the order denying appellants' motion for reconsideration.

Affirmed.