507 F.2d 231
 Alvin SETTLER, Petitioner-Appellant,
v.
Wilson LAMEER, Chief of Police, and O. N. Olney, Chief
Judge, Yakima Tribal Court, Respondents-Appellees.
Alvin SETTLER, Petitioner-Appellant,
v.
Wilson LAMEER, Chief of Police, and William Yallup, Chief
Judge, Yakima Tribal Court, Respondents-Appellees.
Mary SETTLER, Petitioner-Appellee,
v.
Wilson LAMEER, Chief of Police, and William Yallup, Chief
Judge, Yakima Tribal Court, Respondents-Appellants.
 Nos. 71-2364, 74-1627 and 74-1656.
 United States Court of appeals, Ninth Circuit.
 Nov. 26, 1974.
 
 1
 Francis J. Conklin, S.J. of Gonzaga Law School (argued), Spokane, Wash., for appellant (appellee in 74-1956).
 
 
 2
 Tim Weaver (argued), of Hovis, Cockrill & Roy, Yakima, Wash., for appellees (and cross-appellants).
 
 
 3
 Before TRASK and SNEED, Circuit Judges, and JAMESON,* District judge.
 
 JAMESON, District Judge:
 
 4
 Three actions involving the validity of fishing regulations promulgated by the Tribal Council of the Yakima Indian Nation are joined in this appeal. In causes Nos. 71-2364 and 74-1627 Alvin Settler appeals the denial of his petitions for habeas corpus following separate convictions for violations of tribal fishing regulations in 1967 and 1968. In cause No. 74-1656, which arises out of the same incident as cause No. 74-1627, the Chief of Police and Chief Judge of the Yakima Tribal Court appeal from a decision of the district court granting the petition of Mary Settler for a writ of habeas corpus following her conviction in Tribal court for fishing violations.
 
 I. BACKGROUND
 
 5
 The Yakima Reservation was established by the Treaty with the Yakimas, June 9, 1855. Article III of the Treaty states in pertinent part:
 
 
 6
 'The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; . . . 12 Stat. 951, 953.
 
 
 7
 In 1966, the Yakima Tribal Council[1] enacted regulations deemed necessary to promote the conservation of the fishing resources which were reserved in the Treaty of 1855. Resolution T-90-66 among other things established fishing seasons, prohibited fishing in certain areas, allocated fishing sites, established a tribal identification system, and specified the methods of fishing that were permissible and the type of boats and gear that could be used. In addition it provided methods of enforcement and penalties. Although purporting to regulate fishing activities of tribal members outside of the reservation, the resolution provided for arrest, seizure of equipment and punishment only within the boundaries of the reservation.
 
 
 8
 Resolution T-90-66 was amended in 1968 by T-48-68. That resolution provided for off-reservation enforcement of tribal fishing regulations in the following language:
 
 
 9
 'Any Tribal Game Warden or any Tribal Law Enforcement Officer shall be authorized to enforce the provisions of this and any other regulation of the Yakima Tribe governing the exercise of Treaty fishing rights whether on or off the Yakima Reservation and where violations are committed in his presence, he shall arrest the offender, take him into custody, and seize all fishing gear, boats or motors used by said offender.'
 
 
 10
 The enforcement of these resolutions[2] with respect ot off-reservation tribal fishing is the basis of the three actions.
 
 A. Cause No. 71-2364
 
 11
 Alvin Settler, an enrolled member of the Confederated Tribes and Bands of the Yakima Indian Nation,[3] was convicted on September 29, 1967 by the Yakima Tribal Court of twice violating Tribal Resolution T-90-66[4] and for disobeying the lawful orders of the Tribal Court.[5] It is conceded that on both occasions, Settler was fishing at 'usual and accustomed fishing sites' off the reservation. Although given citations at the site of the violations, Settler was not arrested until he was found within the exterior boundaries of the reservation.
 
 
 12
 In the habeas corpus proceedings instituted by Settler following his conviction, the district court dismissed the petition for lack of jurisdiction. This court reversed and remanded for a hearing on the merits. Settler v. Yakima Tribal Court, 419 F.2d 486 (9th Cir. 1969).[6]
 
 On remand, the district court held:
 
 13
 (1) 'The regulation of the right to fish in the 'usual and accustomed places' off of the reservation granted by the Treaty is an internal affair of the Yakima Indian Tribe . . . Such tribal fishing regulations are binding upon tribal members and are enforceable in the Yakima Indian Tribal Court.'
 
 
 14
 (2) The state has certain limited rights to regulate off-reservation fishing by Indians, but 'such regulation must be necessary for the conservation of the fishery resources'.
 
 
 15
 (3) 'Any right the state may have to impose restrictions on off-reservation fishing activities does not preclude the Yakima Indian Tribe from placing restrictions on its own members to control their fishing activities (off reservation) where state regulations are inapplicable, unenforceable, or nonexistent.'
 
 B. Causes Nos. 74-1627 and 74-1656
 
 16
 Mary Settler, also a member of the Yakima Indian Nation, was convicted by the Yakima Tribal Court on August 21, 1968 for a violation of Tribal Resolution T-90-66, as amended, and for resisting lawful arrest and attempting escape.[7] Tribal officers, acting pursuant to Tribal Resolution T-58-68, arrested Mary at a 'usual and accustomed' fishing site approximately 56 miles outside the confines of the Yakima Reservation. At the time of Mary's arrest by Tribal Fish and Game Wardens, her fishing gear was seized and is being held pending the final outcome of this action.
 
 
 17
 As a result of the same incident, Alvin Settler was convicted of a violation of T-90-66, as amended, for knowingly allowing his fishing crew to fish during the Yakima Tribe's closed season and to use illegal fishing gear registered in his name.[8] Unlike Mary, Alvin was arrested within the external boundaries of the reservation.
 
 
 18
 Petitions for writ of habeas corpus filed by both Mary and Alvin were denied for lack of jurisdiction. On appeal, this court reversed (Settler v. Lameer, 419 F.2d 1311 (9th Cir. 1969)) and remanded for proceedings on the merits.
 
 
 19
 On remand, the district court, ruling on cross motions for summary judgment in the case of Mary Settler, held that:
 
 
 20
 (1) the arrest of Mary Settler some 56 miles outside of the Reservation was unauthorized and unlawful. The enforcement of Tribal fishing regulations 'is limited to arrest and seizure on the reservation, . . . even though the Tribe has the authority to govern the exercise of the Indian's right to take fish at the 'usual and accustomed places' located off of the reservation'.
 
 
 21
 (2) '. . . because the Tribal authorities lacked jurisdiction to enforce Tribal Regulations off the reservation, the seizure of petitioner's personal property incident to petitioner's arrest was unlawful'.
 
 
 22
 The court denied Alvin Settler's petition, noting that the issues were the same as those in No. 71-2364, supra.
 
 Issues on appeal
 
 23
 The two primary issues presented on appeal are:
 
 
 24
 (1) Whether the Yakima Indian Nation may enforce its fishing regulations with respect to violations committed by Tribal members outside the reservation by arresting and trying violators upon their return to the reservation;
 
 
 25
 (2) Whether and under what circumstances the Yakima Indian Nation may enforce tribal fishing regulations by physically arresting violators and seizing their fishing gear at the usual and accustomed fishing places off the Yakima Reservation.
 
 
 26
 A third issue is raised by Alvin Settler with respect to his conviction by the Tribal Court in 1967. Settler contends that his constitutional rights under the Fifth and Sixth Amendments were violated in that he was tried twice for the same offense and was dinied the assistance of professional counsel.
 
 
 27
 II. APPLICATION OF FISHING REGULATIONS OT OFF RESERVATION TO OFF RESERVATION FISHING
 
 
 28
 Mary and Alvin Settler and the State of Washington[9] contend that the Yakima Indian Nation may not regulate off-reservation Tribal fishing activities because (a) in the Yakima Treaty of 1855, the Confederated Tribes of the Yakima Nation did not reserve the right to exercise criminal jurisdiction beyond the territorial confines of the reservation; (b) Congress has not subsequently authorized the Yakima Nation to exercise criminal jurisdiction beyond the territorial confines of the reservation; and (c) any Tribal exercise of criminal jurisdiction outside of the reservation would be in derogation of the sovereignty of the State of Washington.
 
 
 29
 (a) The Treaty with the Yakimas, June 9, 1855.
 
 
 30
 As part of a government policy to extinguish Indian title to property in the Western United States (Appropriation Act of March 3, 1853, 10 Stat. 226, 238), Isaac Stevens, the first Governor of the Territory of Washington was appointed in 1854 to negotiate treaties with all of the Indian tribes in the Washington Territory.[10] 'Governor Stevens was directed that in making the treaties, he should endeavor to unite the 'numerous bands and fragments of tribes into tribes . . ." United States v. Washington, 384 F.Supp. 312 (W.D.Washington, 1974, appeal pending (C.A. 9, No. 74-2440)). Pursuant to these directives, Governor Stevens negotiated a treaty with fourteen tribes and bands of Indians living in Western Washington who by the terms of the Treaty comprise the Yakima Nation. 12 Stat. 951. By that Treaty, the confederated tribes composing the Yakima Nation 'gave up their claim by Indian title to a large expanse of territory over which they roamed in return for the United States' recognition of a portion of the area claimed under Indian title as a reservation for the Yakima Nation . . .'. Whitefoot v. United States, 293 F.2d 658, 659, 155 Ct.Cl. 127 (1961), cert. denied 369 U.S. 818, 82 S.Ct. 629, 7 L.Ed.2d 784 (1962).
 
 
 31
 One of the most important provisions of that Treaty from the standpoint of the tribes and bands of Indians was that preserving the Indians' right to take fish at 'all usual and accustomed places'. As the Supreme Court noted in Tulee v. Washington, 315 U.S. 681, 684, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942), 'From the report . . . of the proceedings in the long council at which the treaty agreement was reached, we are impressed by the strong desire the Indians had to retain the right to hunt and fish in accordance with the immemorial customs of their tribes'. The right to fish was of vital import to the Indians; it was 'not much less necessary to the existence of the Indians than the atmosphere they breathed'. United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1904). In Whitefoot, supra, 293 F.2d at 659, Mr. Justice Reed (retired) noted: 'Then (when the Treaty was made), as now, fishing . . . was important to the Indians and provided them their food, fresh and dried, and a medium for acquiring other commodities'.[11] In addition, fish also were important in Tribal religious ceremonies.
 
 
 32
 (b) Extent of Treaty Fishing Rights.
 
 
 33
 The Settlers and the State of Washington do not question the existence of Tribal fishing rights or the right of the Yakima Nation to regulate fishing activities within the reservation boundaries. The Settlers expressly recognize also that the Tribal Council may 'enact regulations concerning the fishing by tribal members at the usual and accustomed off reservation treaty sites'. They contend, however, that the Treaty constituted a relinquishment of all Tribal jurisdiction beyond the confines of the reservation; that Congress has never subsequently authorized the Yakima Nation to exert such jurisdiction; and that the State of Washington has exclusive enforcement powers off the reservation. The State of Washington claims 'sole and exclusive authority to regulate fishing activities in off-reservation waters'.
 
 
 34
 In interpreting the language of treaties with the Indians, the court must consider 'how the words of the treaty were understood by the unlettered people, rather than their critical meaning'. Worcester v. Georigia, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832); Winans, supra, 198 U.S. at 380-381, 25 S.Ct. 662, 49 L.Ed. 1089.[12] Moreover, in interpreting Indian treaties the Supreme Court has consistently followed the general rule that 'Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith'. Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930).[13]
 
 
 35
 The Treaty expressly reserved to the confederated tribes and bands of Indians 'the right of taking fish at all usual and accustomed places, in common with citizens of the Territory'. It would be unreasonable to conclude that in reserving these vital rights, the Indians intended to divest themselves of all control over the exercise of those rights.[14] Prior to the Treaty the regulations for fishing had been established by the Tribe through its customs and tradition. The Indians must surely have understood that Tribal control would continue after the Treaty.[15]
 
 
 36
 In addition, the Treaty of 1855 does not expressly state that the Yakima Nation relinquished its jurisdiction over matters pertaining to fishing rights. As the treaty constitutes a grant of rights from the Indians to the Government, Winans, supra, 198 U.S. at 381, 25 S.Ct. 662, 49 L.Ed. 1089, any rights not granted must be considered retained by the Tribe. Here, the Indians qualified their fishing right only to the extent of permitting citizens of the territory to fish 'in common' with them at 'usual and accustomed fishing places' off the reservation. Given this fact and the vital role of fishing in the Yakima culture, we conclude that the Yakima Nation did reserve the authority to regulate Tribal fishing at 'all usual and accustomed places', whether on or off the reservation.
 
 
 37
 This conclusion is supported by the nature of the fishing rights. As set forth in Whitefoot, supra, 293 F.2d at 663, the fishing rights reserved in the Treaty of 1855 are communal rights of the Tribe, even though the individual members benefit from those rights. The determination of when and how the rights may be exercised is an 'internal affair' of the Tribe. As the district court correctly pointed out, 'one of the last remnants of sovereignty retained by the Yakima Indian Tribe is the power to regulate their internal and social relations'. This was recognized in Williams v. Lee, 358 U.S. 217, 221-222, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959) with reference to the Treaty with the Navajo Tribe:
 
 
 38
 'implicit in these treaty terms, as it was in the treaties with the Cherokees involved in Worcester v. Georgia, was the understanding that the internal affairs of the Indians remained exclusively within the jurisdiction of whatever tribal government existed.:
 
 
 39
 The mere fact that the fishing may take place off the reservation does not make the regulation of treaty fishing any less an internal matter. The locus of the act is not conclusive. Littell v. Nakai, 344 F.2d 486, 490 (9 Cir. 1965). The Tribe has the authority to regulate the exercise of the fishing rights it retained at 'all usual and accustomed places', even those off the reservation.
 
 
 40
 This does not mean that the State of Washington is without any authority to regulate off-reservation fishing. That power has been expressly recognized, but it has been strictly limited.
 
 
 41
 In Tulee v. Washington, supra, the Court held that the State of Washington could not require Indians fishing under the Treaty of 1855 to obtain a license for fishing at 'usual and accustomed places' off the reservation. The Court further stated that any regulations which are imposed by the state on off-reservation fishing by Yakima Indians must be reasonable and 'necessary to the conservation of fish'. Id., 315 U.S. at 684, 62 S.Ct. at 864. This position was recently reaffirmed in Puyallup Tribe v. Department of Game, 391 U.S. 392, 398, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) wherein the Court, in construing a treaty fishing provision identical to that here, stated:
 
 
 42
 'The right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States . But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.'
 
 
 43
 We agree with the district court in cause No. 71-2364 that 'once the limits of state authority have been reached there remain significant areas of fishing activities which are not necessarily subject to state regulation. Among the fishing activities particularly susceptible to regulation by the Tribe are: (1) the use of accustomed fishing places; (2) the allocation of fishing time among individual members of the Tribe; (3) the type of gear; (4) the time of taking fish; (5) the determination of preference among fishing purposes, i.e. subsistence, commercial, or ceremonial.'We conclude that the regulation of these activities with respect to off-reservation fishing is within the scope of the rights retained by the Yakima Nation in the Treaty of 1855.[16] Appellees had the authority to arrest and prosecute tribal members for violation of the Tribal fishing regulations. The district court correctly held in 71-2364 and 74-1627 that an arrest on the reservation for violation of fishing regulations off the reservation is valid.
 
 III. OFF-RESERVATION ARREST AND SEIZURE
 
 44
 We turn now to the question presented in the Mary Settler case, No. 74-1656: whether the Yakima Nation has the right under its Tribal Resolution T-48-68 to enforce tribal fishing regulations by arrest and seizure at 'usual and accustomed' fishing places off the reservation.
 
 
 45
 The district court concluded that, 'The incidents of sovereignty retained by the Indian tribes on the reservation do not include the authority to make an arrest outside of the territorial limits and confines of the Reservation to enforce an Indian Tribal regulation'. In support of its position, the court cited Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-149, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); Puyallup Tribe v. Department of Game, supra, 391 U.S. at 398, 399-400, 88 S.Ct. 1725, 20 L.Ed.2d 689; Organized Village of Kake v. Egan, 369 U.S. 60, 67-69, 71-73, 75-76, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); Tulee v. Washington, supra, 315 U.S. at 684, 62 S.Ct. 862, 86 L.Ed. 1115; Shaw v. Gibson-Zahnisor Oil Corp., 276 U.S. 575, 579-580, 48 S.Ct. 333, 72 L.Ed. 709 (1928); Kennedy v. Becker, 241 U.S. 556, 562-564, 36 S.Ct. 705, 60 L.Ed. 1166 (1961); United States v. Winans, supra, 198 U.S. at 384, 25 S.Ct. 662, 49 L.Ed. 1089; and Ward v. Race Horse, 163 U.S. 504, 510-511, 513-515, 16 S.Ct. 1076, 41 L.Ed. 244 (1896).
 
 
 46
 None of those cases, however, involve the precise issue before this court, i.e. whether tribal enforcement powers extend to 'usual and accustomed' fishing places beyond the confines of the reservation. Rather, they consider the question of state regulation of off-reservation activities. The only case we have found which discusses the question of off-reservation regulation by a tribe is United States v. Washington, supra. There the court held that, 'The Yakima Nation and the Quinault Tribe are presently qualified to self-regulate the off-reservation fishing of their tribal members'.[17] The court, however, did not deal specifically with the question of off-reservation arrest and seizures by tribal law enforcement officers.
 
 
 47
 In resolving this issue, we must again look to the intention of the Indians at the time of the Treaty. Having determined that the Yakima Nation by the Treaty of 1855 intended to retain not only their ancient fishing rights but also the power to regulate the exercise of those rights regardless of location, it would be inconsistent to narrowly limit the enforcement of those rights to arrest and seizure on the reservation. The power to regulate is only meaningful when combined with the power to enforce.
 
 
 48
 The district court has suggested two alternative methods of enforcing the tribal regulations: (1) withholding 'the rights or benefits of the protection of Treaty created immunities'; and (2) 'wait until a transgressor has returned to the reservation and then make an arrest and confine that person or cause him to be present in court'. Either method at best affords only a partial solution to the enforcement problem. For either to be effective, it would be necessary for the Yakima Nation to have its game wardens or other enforcement officers patrol 'usual and accustomed' fishing places off the reservation and check licenses, fishing gear, and the quantity and nature of a catch in order to establish violations for which the Tribe may impose criminal penalties.
 
 
 49
 The second suggested method would of course be available only in the event the violators came voluntarily to the reservation. Many members of the Tribe, including the Settlers, do not reside on the reservation and could easily avoid arrest by staying away from the reservation. Sanctions imposed upon non-reservation members by withholding fishing privileges would also be difficult to enforce in the absence of the power to arrest.
 
 
 50
 The regulatory authority retained by the Yakima Nation with respect to the exercise of its off-reservation fishing rights can be truly effective only through off-reservation enforcement powers at the 'usual and accustomed' fishing places.[18] In United States v. Winans, supra, 198 U.S. at 381, 25 S.Ct. 662, 49 L.Ed. 1089, the Supreme Court characterized the fishing rights secured by the Treaty of 1855 as constituting 'a servitude upon every piece of land as though described therein'. Tribal jurisdiction extends to such land for the limited purpose of preserving tribal fishing rights connected therewith.
 
 
 51
 Throughout their briefs, the Settlers and the State of Washington contend that any recognition of tribal jurisdiction outside the confines of the reservation violates the sovereignty of the State of Washington. In support of this argument reliance is placed on the 'equal footing' doctrine enunciated in Ward v. Race Horse, supra. In Race Horse, the Court held that the Enabling Act admitting Wyoming to the Union, 26 Stat. 222 (1890) invalidated certain off-reservation hunting provisions in the Bannock Indian Treaty of 1869. According to the Court, to hold these hunting provisions of the treaty viable would be to deny Wyoming 'equal footing' with the other states.
 
 
 52
 The strict construction and application of the 'equal footing' doctrine in Race Horse has been modified by implication. See, Johnson v. Gearlds, 234 U.S. 422, 438-440, 34 S.Ct. 794, 58 L.Ed. 1383 (1914); Donnelly v. United States, 228 U.S. 243, 259-264, 33 S.Ct. 449, 57 L.Ed. 820 (1913); and United States v. Winans, supra, 198 U.S. at 381-384, 25 S.Ct. 662, 49 L.Ed. 1089.[19] Every state entering the Union is admitted subject to all treaties currently in effect. In the event of a conflict between state law and a prior treaty, the prior treaty must take precedence. Only Congress may modify or abrogate a treaty.
 
 
 53
 We conclude that by the Treaty of 1855 the Yakima Indian Nation retained regulatory and enforcement powers with respect to tribal fishing at all 'usual and accustomed places' off the reservation. No act of Congress, including the Washington Enabling Act, 25 Stat. 676 (1889), has qualified these reserved powers. The powers therefore continue to exist.
 
 
 54
 In so holding, we are not blind to the potential for both regulatory and enforcement problems. Any problems which may arise, however, are a product of the vast changes that have taken place in the almost 120 years since the signing of the Yakima Treaty in 1855. These changed conditions may necessitate a modification of the treaty. Obviously, the courts may not re-write treaties or qualify the Indian rights thereunder. If Treaty changes should be required, that is a matter for Congress.
 
 
 55
 Our holding that the Yakima Indian Nation may enforce its fishing regulations by making arrests and seizures off the reservation is a very narrow one. Off-reservation enforcement is limited strictly to violations of tribal fishing regulations. The arrest and seizure of fishing gear must be made at 'usual and accustomed places' of fishing, and only when violations are committed in the presence of the arresting officer.[20] Tribal officers patrolling off-reservation sites are subject to all reasonable regulations that may be imposed by the State of Washington for the orderly conduct of inspections, arrests and seizures. Cooperation between state, local and Tribal officials is encouraged. Ultimately, effective regulation of the fishing resource is of benefit to both Indian and non-Indian.[21]
 
 VI. VIOLATION OF CONSTITUTIONAL RIGHTS
 
 56
 Finally, Alvin Settler contends in No. 71-2364 that the district court erred in failing to consider his contention that the Tribal Court had violated his constitutional rights by denying him the right to professional counsel and by trying him twice for the same offense. The opinion of the district court noted that the original petition alleged these additional grounds but that they 'are not now urged' by reason of provisions of the Indian Civil Rights Act of 1968, 25 U.S.C. 1301 et seq.[22]
 
 
 57
 (a) Denial of Right to Professional Counsel
 
 
 58
 In cause No. 74-1627 the parties filed a 'Stipulation as to Facts and Issues on Motions for Summary Judgment' which reads in part:
 
 
 59
 'As stated in the stipulation in No. 2454, (No. 74-1656, the Mary Settler case) the contention as to professional counsel has been withdrawn by counsel for Petitioner and is no longer at issue in this case, because the Yakima Indian Nation now permits tribal members to be represented by professional counsel in tribal court proceedings.'
 
 
 60
 The file in 74-2364 does not contain a similar stipulation, and in that case Alvin continues to urge this alleged denial of his constitutional rights.
 
 
 61
 The 1967 Tribal proceedings against Alvin Settler involved misdemeanors. Section 8, Chapter 1 of the Law and Order Code of the Yakima Indian Nation prohibited the appearance of 'professional attorneys' in Tribal Court.[23] It did, however, provide for representation by members of the Tribe. Alvin Settler was offered and he rejected this representation.
 
 
 62
 Counsel have not cited nor have we found any case prior to the enactment of the Indian Civil Rights Act of 1968 which guarantees the Sixth Amendment right of counsel to Indians appearing in tribal courts. As noted in the ligislative history of the 1968 Act, 'The Federal courts generally have refused to impose constitutional standards on Indian tribal governments, on the theory that such standards apply only to State or Federal governmental action, and that Indian tribes are not States within the meaning of the 14th Amendment'. Senate Report No. 721, 2 U.S.Code Cong. & Admin.News, pp. 1837, 1864 (90th Cong. 2nd Sess. 1968). Senator Ervin, sponsor of the 1968 Act, described the Act in part as follows: '. . . The reservation Indian now has no Constitutional rights. The purpose of the amendment is to give these Indians constitutional rights which other Americans enjoy.' 14 Cong.Rec. 5836 (1968).
 
 
 63
 There are many cases supporting the conclusion that prior to the 1968 Act constitutional rights were not applicable to Indian tribes and Indians living on reservations. The leading case is Talton v. Mayes, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896) wherein the Supreme Court held that the Fifth Amendment was not applicable to the Cherokee Nation. The Court stated:
 
 
 64
 '. . . the existence of the right in congress to regulate the manner in which the local powers of the Cherokee Nation shall be exercised does not render such local powers Federal powers arising from and created by the constitution of the United States. It follows that as the powers of local self-government enjoyed by the Cherokee Nation existed prior to the constitution, they are not operated upon by the fifth amendment, which, as we have said, had for its sole object to control the powers conferred by the constitution on the national government.' Id. at 384, 16 S.Ct. at 989. This rationale was followed in subsequent cases involving the application of the Bill of Rights and the Fourteenth Amendment to the Indian Tribes. Barta v. Oglala Sioux Tribe of Pine Ridge Reservation, 259 F.2d 553 (8 Cir. 1958), cert. den., 358 U.S. 932, 79 S.Ct. 320, 3 L.Ed.2d 304 (1959); Martinez v. Southern Ute Tribe of Southern Ute Reservation, 249 F.2d 915 (10 Cir. 1957), cert. den., 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958); Native American Church of North America v. Navajo Tribal Council, 272 F.2d 131 (10 Cir. 1959). Felix Cohen concluded in his treatise on Indian law: 'Many important prohibitions, including the Bill of Rights of the Federal Constitution, are limitations only on the power of the Federal Government. Other provisions limit the activities of state governments only, or of the federal and state governments, and hence are inapplicable to Indian tribes, which are not creatures of either the federal or state governments.' Cohen, Handbook of Federal Indian Law (1942) p. 181.
 
 
 65
 Following Talton v. Mayes and the other cases cited supra, it was held in Glover v. United States, 219 F.Supp. 19, 21 (D.Mont.1963), that 'the provisions of the Federal Constitution guaranteeing . . . the right to counsel do not apply in prosecutions in tribal courts'. As the court stated:
 
 
 66
 'The right to be represented by counsel is protected by the Sixth and Fourteenth Amendments. These amendments, however, protect these rights only as against action by the United States in the case of the Fifth and Sixth Amendments, and as against action by the states in the case of the Fourteenth Amendment. Indian tribes are not states within the meaning of the Fourteenth Amendment.'
 
 
 67
 Here the proceedings in Tribal Court occurred prior to the enactment of the indian Civil Rights Act of 1968. Accordingly we find no merit in the contention that the Tribal Court deprived petitioner of his constitutional rights by denying him representation by professional counsel.[24]
 
 
 68
 (b) Claim of Double Jeopardy
 
 
 69
 The only reference to the claim of double jeopardy in the record submitted to this court appears in the petition filed on November 6, 1967 in 71-2364. As noted supra, Alvin Settler was convicted in Tribal Court of fishing violations on July 14, 1967 and August 8, 1967 and for a third offense of violating lawful orders of the Tribal Court. The petition alleged that in Tribal Cause 11316, involving the offense committed on July 14, 1967, Settler was tried, found guilty, and sentenced to a 30 day suspension (from fishing activities) or $80.00 fine; that the court discovered that the prosecutor had testified to the allegations in case 11538 (the offense committed on August 8) by mistake and to correct the error set aside the conviction in 11316 and 'proceeded to retry petitioner upon the same charge but with a corrected recitation of allegations pertinent to July 14, 1967'. Upon completion of the second trial, the same sentence was imposed.
 
 
 70
 Assuming the correctness of the allegations in the petition,[25] the retrial did not constitute double jeopardy. See Ball v. United States, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); United States v. Tateo,377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964); United States v. Ewell, 383 U.S. 116, 124-125, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).[26]
 
 
 71
 The judgments of dismissal in No. 71-2364 and No. 74-1627 are affirmed. The judgment in No. 74-1656 is reversed, and the cause remanded for dismissal of the petition.
 
 
 
 *
 Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation
 
 
 [1]
 The Yakima Indian Nation is not a tribe organized under the Wheeler-Howard Indian Reorganization Act, 48 Stat. 984, 25 U.S.C. 476, but exists by reason of the Treaty of 1855
 
 
 [2]
 The Bureau of Indian Affairs, acting pursuant to 25 CFR 11.1(e), approved Resolution T-90-66 by a letter on April 18, 1966 (revised by letter of May 10, 1966) from the Acting Commissioner to the Tribal Council. The Bureau approved Resolution T-48-68 in letters from the acting commissioner and the Commissioner dated April 17 and May 17, 1968
 
 
 [3]
 Neither Mary nor Alvin Settler resided on the Yakima Reservation
 
 
 [4]
 Settler was charged with two separate offenses, committed on July 14, 1967 and August 8, 1967, of fishing for salmon with a gillnet in the Columbia River during the closed season, in violation of Resolution T-90-66 and sub-resolution T-100-67. For the first offense he was fined $80.00 plus $2.50 court costs and given a thirty day suspension from any fishing activities; and for the second offense was fined $120.00 plus $2.50 court costs and given a ninety day suspension
 At his trial Settler refused to take part in the proceedings. The Tribal Court, in accordance with the Law and Order Code of the Yakima Indian Nation, would not permit him to be represented by professional counsel.
 
 
 [5]
 On this charge the sentence was a fine of $50.00 and $2.50 court costs or 30 days in jail
 
 
 [6]
 Following remand Wilson Lameer, Chief of Police, and O. N. Olney, Chief Judge of the Yakima Nation Tribal Court were added as respondents
 
 
 [7]
 At the time of the fishing violation, the Columbia River and its tributaries had been closed by Emergency Order No. 773 of the Director of Fisheries of the State of Washington as well as by Tribal Resolution T-56-68, an emergency measure passed to protect the fishery. For the fishing violation Mary Settler was fined $225.00 and her treaty fishing activities were suspended for 90 days. For resisting arrest and attempted escape she was given fines totalling $100.00 and $2.50 court costs or a total of 30 days in jail
 
 
 [8]
 On these charges Alvin was fined a total of $450.00 and $2.50 court costs
 
 
 [9]
 The State of Washington filed a brief amicus curiae in 71-2364 in support of its position that the 'state possesses the sole and exclusive authority to regulate fishing activities in off-reservation waters'. The United States filed amicus curiae briefs in 71-2364 and 74-1656 in support of the position of the Chief of Police and Chief Judge of the Yakima Tribal Court
 
 
 [10]
 Under Section 2 of the act creating the Washington Territory, Act of March 2, 1853, 10 Stat. 172, 173, the Governor of the Territory was also to serve as Superintendent of Indian Affairs in the Territory
 
 
 [11]
 The importance of fish in the diet of the Indians was set forth in the Findings of Fact in United States v. Washington, supra:
 'In the main, at the time of the treaty, the Indians who were parties to the Yakima Treaty lived in a food gathering culture. They existed on game, fish, roots, berries and some cultivated vegetables. Of these foods fish was a major food and they landed salmon, steelhead, trout, mussels, eel, and other miscellaneous fish. Salmon, however, both fresh and cured, was a staple in the food supply of these Indians. It was annually consumed by these Indians in the neighborhood of 500 pounds per capita.' Findings of Fact No. 151.
 While the extent of subsistence fishing has decreased since 1855, the Findings of Fact state further:
 'The Yakima Indians have been and continue to be very dependent on anadromous fish to sustain their way of life. They live close to the poverty level and have not reached economic or social parity with non-Indian citizens of the State of Washington. Anadromous fish are vital to the Indians' diet with approximately 2,000 of the enrolled members fishing for personal consumption.' Findings of Fact No. 163.
 
 
 [12]
 The difficulty of explaining the Treaty provisions to the Yakima Indians was expressed in the Findings of Fact in United States v. Washington, supra:
 'Since, however, the vast majority of Indians at the treaty councils did not speak or understand English, the treaty provisions and the remarks of the treaty commissioners were interpreted . . . to the Indians in the Chinook jargon and then translated into native languages by Indian interpreters. Chinook jargon, a trade medium of limited vocabulary and simple grammar, was inadequate to express precisely the legal effects of the treaties, although the general meaning of treaty language could be explained.' Findings of Fact No. 22.
 
 
 [13]
 This rule was most recently quoted with approval in McClanahan v. Arizona Tax Commission, 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)
 
 
 [14]
 The difficulties of ascertaining 'the subjective mental processes' of the Indians in interpreting Article III of the Treaty are well summarized in Whitefoot v. United States, supra, 293 F.2d at 667, n. 15:
 'The treaty was dictated by white conquerors of a subjugated race. It is inconceivable that there was the kind of arms-length bargaining as to terms which would have made relevant as ascertainment of the Indian intention. Naturally the Indians wanted the unattainable-- to be left alone. It is doubtful that the untrained Indian mind understood the ambiguities of Article III even though the white representatives went to some pains to explain the provision. A great and unbridgeable voik existed between the language and culture of the two races. When one considers that the meaning of Article III was sufficiently in doubt as to require the interpretative services of the Supreme Court and several lesser courts in subsequent years, one can readily forgive the Indians for any lack of perspicacity or, indeed clairvoyance.'
 
 
 [15]
 As indicative of tribal intent in this regard, it is important to note that in fact tribal custom and tradition did continue to 'regulate' the nature of tribal fishing for many years after the Treaty. Whitefoot v. United States, supra, 293 F.2d at 667, n. 15, 668-669
 
 
 [16]
 The argument that to permit tribal jurisdiction beyond the boundaries of the reservation is a violation of the sovereignty of the State of Washington is without merit. The various Indian treaties constitute the Supreme Law of the Land. Upon entering the union, the State of Washington and all other staes were bound by those treaties. U.S.Const. Art. VI. See also, Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 S.Ed. 641 (1920)
 
 
 [17]
 The court said further:
 'The uncontradicted evidence shows that for a considerable time the Quinault and Yakima tribes have adopted and effectively enforced tribal fishing regulations which in some material respects are more restrictive than the regulations of Fisheries and Game. To a considerable extent those tribes have consulted and cooperated with Fisheries and Game in matters pertaining to responsible regulation of Indian fishing.'
 
 
 [18]
 In view of the strict limitation on the power of the state to regulate Indian off-reservation fishing, there would be no effective regulation and enforcement of a broad range of fishing activities if enforcement powers are denied to the Tribe
 
 
 [19]
 The contention of the Settlers and the State of Washington that Mescalero v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) 'emphatically reaffirmed' the strict construction of the 'equal footing' doctrine in Race Horse is untenable. The only reference to Race Horse was dictum and merely cited the case for the proposition that 'Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State'. Mescalero, supra, 411 U.S. at 148-149, 93 S.Ct. at 1270
 
 
 [20]
 As noted supra, Mary Settler was arrested and the fishing gear seized at a 'usual and accustomed' fishing site for a violation committed in the presence of the arresting officers
 
 
 [21]
 The Yakima Nation may be in a better position than the State of Washington to regulate off-reservation fishing. The Tribe posesses the knowledge of its individual members and their fishing sites, and only the Tribe has the authority to revoke a Tribal member's fishing privileges
 
 
 [22]
 The court quoted the following excerpt from the Act:
 1302. Constitutional rights.
 No Indian tribe in exercising powers of self-government shall--
 . . . .tri
 (3) subject any person for the same offense to be twice put in jeopardy;
 . . . .t a
 (6) deny to any person in a criminal proceeding . . ., and at his own expense to have the assistance of counsel for his own defense; . . ..'
 
 
 [23]
 Similar provisions are found in many tribal law and order codes
 
 
 [24]
 As noted supra, the Indian Civil Rights Act of 1968 provides that no Indian tribe shall deny to any person in a criminal proceeding the right 'at his own expense to have the assistance of counsel for his defense'. it is unnecessary to decide whether the furnishing of non-professional tribal counsel to indigent defendants would comply with the Act
 
 
 [25]
 The certificate of proceedings of the Tribal Judge makes no reference to the facts alleged in the petition on which the claim of double jeopardy is based. These facts were not, however, denied in respondents' answer
 
 
 [26]
 Moreover, as indicated supra, the constitutional prohibition against double jeopardy would not have been applicable since the tribal proceedings occurred prior to the Indian Civil Rights Act of 1968