**LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,**

**v.**

**STATE OF WISCONSIN; Wisconsin Natural Resources Board; Carroll D. Besadny; James Huntoon; and George Meyer, Defendants.**

No. 74–C–313–C.

United States District Court, W.D. Wisconsin.

Aug. 21, 1987.

James E. Zorn, Hayward, Wis., James L. Beck, Wisconsin Judicare Inc., Wausau, Wis., for Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

Milton Rosenberg, Madison, Wis., for Red Cliff Band of Lake Superior Chippewa Indians.

Earl Charleton, Milwaukee, Wis., for Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin.

Howard Bichler, Webster, Wis., for St. Croix Chippewa Indians of Wisconsin.

Candy L. Jackson, Odanah, Wis., for Bad River Band of the Lake Superior Chippewa Indians.

Kathryn Tierney, James Janetta, Lac du Flambeau, Wis., for Lac du Flambeau Band of Lake Superior Chippewa Indians.

Mary V. Bowman, Charles Larson, James McDermott, Asst. Atty. Gens., Madison, Wis., for defendants State of Wis., Wisconsin Natural Resources Bd., Carroll D. Besadny, James Huntoon, and George Meyer.

CRABB, Chief Judge.

This lawsuit, concerning the scope and extent of the plaintiff tribes' usufructuary rights in the territory ceded by the Chippewa treaties of 1837 and 1842, is now in the "regulatory phase" of the litigation. Prefatory to the regulatory phase trial scheduled for the spring of 1988, I have requested the parties to brief the issue of what legal standards this court should apply in determining the permissible bounds of state regulation of the tribes' off-reservation rights.

Five broad issues have emerged from the briefs: 1) the appropriate legal standard to apply to state regulation for the purpose of conservation; 2) whether the state may regulate for any legitimate purpose or whether it may regulate only for conservation; 3) more specifically, whether the state may regulate for health and safety purposes and, if so, the appropriate legal standard to apply; 4) whether the state may regulate to enforce the moderate living standard apportioned to the tribes; and 5) whether tribal self-regulation will preempt or preclude concurrent state regulation.

### 1. *Regulation for Conservation*

The parties do not dispute that under certain circumstances the state may regulate in the interests of conservation. Their disagreement occurs in defining the circumstances.

The tribes argue that the state first must show necessity, irreparable harm, and the absence of effective tribal self-regulation before it may regulate a specific usufructuary activity, relying on *United States v. Michigan*, 653 F.2d 277, 279 (6th Cir.1981). The tribes assert further that once the state meets this initial test, it must then show that the regulation is necessary for conservation, is the least restrictive alternative, and does not discriminate against the Indian harvest. The state agrees that its regulations must be reasonable and necessary for conservation and must not discriminate against the Indians, but rejects the concepts of irreparable harm and tribal self-regulation. Whether tribal regulation precludes state regulation will be discussed in section five.

Aside from the tribal self-regulation issue, I do not perceive any serious disagreement between the parties as to the basic standard for conservation regulations. The state may regulate the off-reservation treaty usufructuary rights of the plaintiff tribes so long as the regulations are reasonable and necessary to the conservation of a particular species or resource in a particular area and do not discriminate against the Indians. *Puyallup Tribe v. Dept. of Game of Washington*, 391 U.S. 392, 398–401, 88 S.Ct. 1725, 1728–30, 20 L.Ed.2d 689 (1968) (hereafter *Puyallup I*); *Antoine v. Washington*, 420 U.S. 194, 207, 95 S.Ct. 944, 951, 43 L.Ed.2d 129 (1975); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin*, 653 F.Supp. 1420, 1434 (W.D.Wis.1987) (hereafter *LCO III*).

The first prong of the legal standard is that a regulation must be reasonable and necessary for conservation. Conservation in the context of treaty usufructuary rights includes the perpetuation of a

species or resource as well as measures designed to ensure a reasonable margin of safety against extinction. *United States v. State of Oregon*, 718 F.2d 299, 305 (9th Cir.1983); *Sohappy v. Smith*, 302 F.Supp. 899, 908 (D.Ore.1969). A conservation regulation is reasonable if it is "appropriate to its purpose." *United States v. State of Washington*, 384 F.Supp. 312, 342 (W.D. Wash.1974), *aff'd*, 520 F.2d 676 (9th Cir. 1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). A conservation measure is necessary if it is "essential to conservation." *Id.* The essential nature of the regulation depends upon a showing that there is a need to limit the taking of the particular species or resource in the particular geographic area, and that the particular regulation is necessary to accomplish that limitation. *Sohappy*, 302 F.Supp. at 908. In addition, the state must demonstrate not only that the regulation is a reasonable and necessary conservation measure, but also that its application to the tribes is "necessary in the interest of conservation." *Antoine*, 420 U.S. at 207, 95 S.Ct. at 952.

In their initial brief, the tribes propose irreparable harm as an element of the standard distinct from necessity. *See United States v. State of Michigan*, 653 F.2d 277, 279 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981) ("The state bears the burden of persuasion to show ... that it is highly probable that irreparable harm will occur"). In their reply brief, however, the tribes contend that they are not advocating an "endangered species" approach to state regulation, but rather that they chose irreparable harm as a term familiar to lawyers and courts as well as being the language used by the other federal court that has considered the issue of treaty hunting and fishing in the Midwest. Since the plaintiff tribes do not appear now to assert that irreparable harm should be a separate showing from necessity, any perceived conflict between the parties' positions is purely nominal.

■ The tribes propose also that the state regulations must be the least restrictive alternative available. *See United States v. State of Oregon*, 769 F.2d 1410, 1416 (D.Ore.1985); *Michigan*, 653 F.2d at 279. The state does not appear to contest this standard, and the least restrictive alternative does not appear incompatible with the reasonable and necessary test. Indeed, if in order to regulate treaty usufructuary activities the state must show that it is necessary to limit the harvest of a particular species or resource, and that the proposed regulation is necessary to effectuate that limitation, and that application of the proposed regulation to the tribes is necessary, it is doubtful that any regulation that is not the least restrictive alternative would survive. However, the tribes have proposed the explicit addition of a least restrictive alternative component to the test for state regulation. The late Judge James E. Doyle found that neither the Chippewa nor the government, at the time of the treaties of 1837 and 1842, contemplated governmental regulation of the natural resources in the ceded territory. *LCO III*, 653 F.Supp. at 1434. I find that it would accord with the tribes' understanding at the time of the treaties to confine the state now to the least restrictive alternative available to accomplish its conservation purposes.

[4] Plaintiffs assert that a further component of the necessity prong is that the state must demonstrate that its conservation purpose cannot be achieved solely through regulation of non-treaty users of the resource. The tribes base this component on the Supreme Court's statement that a state must show that its regulation is reasonable and necessary "*and* that its application to the Indians is necessary in the interest of conservation." *Antoine*, 420 U.S. at 207, 95 S.Ct. at 952 (emphasis in original). The state appears to agree with this component in part, contending that the state would have to accomplish its conservation goals by limiting non-treaty harvests until such time as tribe members had taken their treaty share of the resource. I do not find these formulations incompatible. As part of the showing of necessity, the state must demonstrate that application of the particular regulation to the Indians is necessary. It is unlikely that it would be necessary to conservation to apply a regu-

lation to the Indian harvest if regulation of non-treaty harvesting would accomplish the same goal. By the same token, if and when it becomes necessary to allocate a particular resource and the tribes use their full allocation, then the only remaining legitimate harvesters of that resource would be non-members of the treaty tribes, whom the state may regulate in any case.

■ The second prong of the basic test for state regulation is that the regulations must not discriminate against the Indians. Although both parties agree with this standard, the tribes propose that its practical effect is that "state regulations which fail to accord recognition to the existence of treaty rights are *per se* discriminatory." Plaintiffs' Reply Brief on Scope of State Authority to Regulate Tribal Member Activities, at 7. I do not believe it is necessary for every state regulation of natural resources to recognize explicitly the tribes' usufructuary rights to the particular resource in question. It is well established in the case law that a facially neutral state regulation applied in a non-discriminatory manner nonetheless may discriminate against tribal usufructuary rights. *Department of Game of Washington v. Puyallup Tribe,* 414 U.S. 44, 48, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973) ("There is discrimination here because all Indian net fishing is barred and only hook-and-line fishing, entirely pre-empted by non-Indians, is allowed."). The non-discrimination prong of the legal standard for state regulation requires that regulations, in language and in effect, neither discriminatorily harm the Indian harvest nor discriminatorily favor non-treaty harvesters. I will not require as well the unwieldy burden that each regulation recognize the existence of the tribes' treaty rights.

### 2. *Scope of Permissible Regulation*

Although the parties agree that the state may regulate where reasonable and necessary for conservation, they disagree fundamentally as to any further permissible scope of state regulation. The state proposes as a general standard that it may regulate by "reasonable means to accom-

plish a permissible purpose" and that its regulations must be necessary for conservation "or any other permissible purpose." Defendants' Brief on Scope of State Authority to Regulate, at 4, 7. By contrast, the plaintiff tribes assert that conservation is the sole purpose for which the state may regulate the tribes' usufructuary activities.

There is support in the case law for the tribes' position. Courts addressing treaty fishing rights in the Pacific Northwest consistently have limited the state's regulatory authority to the issue of conservation or preservation of the resource. *See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 682, 99 S.Ct. 3055, 3072, 61 L.Ed.2d 823 (1979) (hereafter *Fishing Vessel*) ("Although nontreaty fishermen might be subjected to any reasonable state fishing regulation serving any legitimate purpose, treaty fishermen are immune from all regulation save that required for conservation"); *Puyallup I,* 391 U.S. at 398, 88 S.Ct. at 1728 (treaty right to fish may not be qualified, but aspects of fishing "may be regulated by the State in the interest of conservation"); *Sohappy,* 302 F.Supp. at 908 ("The state may not qualify the federal right by subordinating it to some other state objective or policy. It may use its police power only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource.").

Nonetheless, other courts have indicated that tribal treaty rights may be subject to the exercise of other police powers, notably that of regulating for public safety. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 760 F.2d 177, 183 (7th Cir.1985) (hereafter *LCO II*) ("We doubt that ... a substantial detriment to the public safety is a reasonable adjunct to the rights reserved by the Indians"); *State v. Gurnoe,* 53 Wis.2d 390, 410–11, 192 N.W.2d 892 (1972). *See also* Reynolds, *Indian Hunting and Fishing Rights: The Role of Tribal Sovereignty and Preemption,* 62 N.C.L.Rev. 743, 771 n. 176 (1984).

■ Despite the statement in *Fishing Vessel* that treaty fishing rights are subject only to conservation measures, I cannot limit the state's legitimate interests in that manner in this case. Unlike the case law arising from the Northwest, which primarily concerns the single resource of Pacific salmon, here the plaintiff tribes' usufructuary rights extend to dozens or even hundreds of resources, including several game animals and birds. *LCO III*, 653 F.Supp. at 1426–27. The use of a variety of weapons for hunting alone may operate to confer on the state certain interests not present in the Northwest fishing rights cases. Accordingly, I will not limit the permissible scope of the state's regulatory power to the sole purpose of conservation or preservation of the resources.

This does not mean, however, that the state may regulate the tribes' treaty rights for any purpose. The state's proposal that it may regulate for any legitimate purpose finds no support in the law. The tribes' federally protected rights may not be subordinated to every state objective or policy. *Sohappy*, 302 F.Supp. at 908. Moreover, the state "may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens." *United States v. State of Washington*, 520 F.2d 676, 686 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

> Non-Indians are, of course, not beneficiaries of the preserved rights, and the State remains wholly free to prohibit or regulate non-Indian hunting and fishing. The [treaty and its ratification by Congress] must be construed to exempt the Indians' preserved rights from like state regulation, however, else Congress preserved nothing which the Indians would not have had without that legislation.

*Antoine*, 420 U.S. at 206, 95 S.Ct. at 951.

The state's formulation would permit it, for example, to regulate the tribes' exercise of their usufructuary rights in the interests of encouraging and promoting tourism. While tourism promotion is surely a permissible exercise of the state's police power, subordinating treaty rights to that goal is not. "The state may not qualify the federal right by subordinating it to some other state objective or policy." *Sohappy*, 302 F.Supp. at 908. Accordingly, I cannot concur in the state's position that it be allowed to regulate treaty activities for any permissible purpose. The treaty-guaranteed usufructuary rights of the plaintiff tribes may be regulated by the state only in certain narrowly defined circumstances. One such circumstance, regulation in the interest of conservation, was addressed above. I will proceed to discuss the other specific purposes identified by the state as areas in which it believed it was entitled to regulate, to determine whether the state may regulate in those specific areas and, if so, the appropriate legal standard to apply.

### 3. *Regulation for Health and Safety*

One of the specific instances in which the state claims the authority to regulate treaty usufructuary rights is in the interest of health and safety. As the state notes, a determination of the state's power to regulate for health and safety will be a case of first impression. No court has addressed this issue directly. The Court of Appeals for the Seventh Circuit merely has expressed its "doubt" that the state could not regulate to prevent "a substantial detriment to the public safety." *LCO II*, 760 F.2d at 183. Judge Doyle indicated that it is possible that the state may regulate to control "safety problems arising from incompatible uses of public lands," but declined to express an opinion during the previous declaratory phase of this lawsuit. *LCO III*, 653 F.Supp. at 1433.

■ One criticism of the *Puyallup* line of cases that developed the reasonable and necessary for conservation standard "is their failure to explain the reason why the state may intrude for the particular purpose of conservation." *LCO III*, 653 F.Supp. at 1434. Here, too, neither party developed a rationale to explain why the state either may or may not regulate for health and safety. However, it appears logical that if the state may intrude upon treaty reserved rights to preserve a species or resource, it may intrude as well to preserve its citizens from certain public health

or safety hazards. Accordingly, I find that the state may regulate the tribes' off-reservation treaty rights in the interest of public health and safety, "provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup I*, 391 U.S. at 398, 88 S.Ct. at 1728.

In the development of appropriate standards I have depended heavily upon the reasonable and necessary for conservation test developed by the Supreme Court. It is my intention in doing so that the state's public health and safety regulations will be subject to the same heightened level of scrutiny as its conservation measures. *See* Reynolds, *Indian Hunting and Fishing Rights*, 62 N.C.L.Rev. at 771 n. 176. The state should not be permitted to place a greater burden on the tribes' treaty rights in the interest of public health and safety than it can place on those rights in the interest of conservation. In that light, I find the following to be appropriate standards for the exercise of state regulatory power in the interest of public health and safety.

The state may regulate the tribes' off-reservation treaty rights where the regulations are reasonable and necessary to prevent or ameliorate a substantial risk to the public health or safety, and do not discriminate against the Indians. A public health and safety regulation is reasonable if it is appropriate to its purpose. Such a regulation is necessary if it meets a three part test. First, the state must demonstrate that there is a public health or safety need to regulate a particular resource in a particular area. This requires a showing by the state that a substantial detriment or hazard to public health or safety exists or is imminent. Second, the state must show that the particular regulation sought to be imposed is necessary to the prevention or amelioration of the public health or safety hazard. And third, the state must establish that application of the particular regulation to the tribes is necessary to effectuate the particular public health or safety interest. Moreover, the state must show that its regulation is the least restrictive alternative available to accomplish its health and safety purposes. Finally, as the second prong of the legal standard, the state regulations may not discriminatorily harm the Indians or discriminatorily favor non-treaty harvesters.

In devising this standard for state regulation for the purposes of public health and safety, I have attempted to parallel the heightened scrutiny applied to state regulation of treaty rights in the interest of conservation. I emphasize that the state's ability to regulate the plaintiff tribes' off-reservation usufructuary rights in the interest of public health and safety is narrowly circumscribed. "[I]n each specific particular in which the state undertakes to regulate the exercise of treaty right [usufructuary activity], all state officers responsible therefor must understand that the power to do so must be interpreted narrowly and sparingly applied, with constant recognition that *any* regulation will restrict the exercise of a right guaranteed by the United States Constitution." *Washington*, 384 F.Supp. at 342 (emphasis in original). State regulations that burden treaty-reserved rights must be closely drawn to ensure the minimum possible infringement upon the tribes' treaty rights consistent with accomplishment of the specific recognized interests of the state.

### 4. *Regulation for Moderate Living Allocation*

The state claims the ability not only to regulate in the interest of public health and safety, but to regulate also to ensure adherence to the moderate living standard of allocation developed by Judge Doyle. In *LCO III*, Judge Doyle determined that at the time of the treaties, the Chippewa understood that the off-reservation usufructuary rights they reserved in the treaties would be sufficient to provide them with a moderate living. 653 F.Supp. at 1432, 1434. "When as, and if a need for allocation of resources is required, permanent right in the Chippewa must be recognized as to that quantity which will insure them a modest living." *Id.* at 1435. The moderate living standard was developed by the Supreme Court to determine tribal treaty rights "to a natural resource that once was thoroughly and exclusively exploited by the

Indians." *Fishing Vessel,* 443 U.S. at 686, 99 S.Ct. at 3075. To date, it does not appear that moderate living has been judicially defined. Morisset, *The Legal Standards for Allocating the Fisheries Resource,* 22 Idaho L.R. 609, 613 (1986) (state of Washington requested a determination in 1980, but subsequently failed to file the revised request necessary to trigger further proceedings).

The state appears to rely, at least in part, upon *Sohappy* for the proposition that it can regulate the tribes' off-reservation rights to enforce a moderate living standard. However, that case stands for the proposition that the state may regulate non-treaty harvesters in order to ensure that a moderate living share of the resource is available to the Indians. 302 F.Supp. at 911. The state relies also on a statement of the Supreme Court that the reasonable and necessary to conservation limitation on the state's regulatory power "is nullified in practice when, as here, a court has ordered an apportionment of the opportunity to take the harvestable run." *Washington,* 520 F.2d at 686 n. 3. While I do not understand this passage to imply a right in the state to regulate for apportionment, it is in any event not relevant to this case, at least at this time.

In the *Washington* line of cases, the courts interpreted treaty language that reserved to the tribes a right to fish "in common with" citizens of the territory, and held that that language gave the treaty fishers the right to take up to 50 percent of the harvestable fish. *Washington,* 384 F.Supp. at 343, *aff'd,* 520 F.2d 676. In the present case, no such allocation of resources between treaty and non-treaty harvesters has been made. In fact, Judge Doyle stated specifically that no showing had yet been made that allocation of any resource was necessary, and that no allocation was warranted absent a showing that allocation was necessary or desired by both parties. *LCO III,* 653 F.Supp. at 1434–35. The moderate living standard was developed for use "[w]hen, as, and if a need for allocation of resources is required." *Id.* at 1435.

The state contends that "[t]here will obviously be some quantitative state regulations which are justified by the limitation of the Chippewa harvest to that needed for a 'modest' or 'moderate living.' " Defendants' Brief on Scope of State Authority to Regulate, at 13. The state's argument misconstrues the purpose of the moderate living standard. So long as a resource is abundant for treaty and non-treaty harvesters alike, there is no need to limit the tribes' use to the moderate living standard. If a tribe member becomes wealthy through exploitation of a resource, without diminishing the availability of the resource for others, that accumulation of wealth does not violate the Chippewa treaties. The moderate living standard clearly is intended to establish a minimum treaty harvest. In the event of a scarcity of a resource such that allocation becomes necessary, the tribes are guaranteed so much of the resource as will provide them with a moderate living. In the absence of any necessity for allocation, the tribes are not restricted to a moderate living as an upper limit on their take.

The state's contention that it may regulate to ensure the moderate living "limitation" on the tribes' usufructuary rights is misplaced. Existing case law indicates that the state may regulate non-treaty harvesters to ensure the tribal entitlement to a moderate living, not that the state may regulate treaty harvesters to enforce a moderate living ceiling on the tribal harvest. *Fishing Vessel,* 443 U.S. at 682, 99 S.Ct. at 3072; *Sohappy,* 302 F.Supp. at 911. As I have just noted, in the absence of a need to allocate a resource, the tribes are not limited to a moderate living standard. No justification for allocation of any resource has yet been presented in this case. Furthermore, the state's contention would permit the state to determine, unilaterally by regulation, what constituted a moderate living with regard to the regulated resource. Such a determination, made without even tribal participation, would infringe impermissibly upon tribal self-governance. At an irreducible minimum, the tribes surely have a right to a say in what

constitutes a moderate living for their people.

■ The tribes argue that unless or until allocation of a particular resource becomes necessary, the state's assertion that it may regulate to ensure tribal compliance with the moderate living standard is premature. I am persuaded that the tribes' position is correct for a number of reasons. First, unilateral state determination of what constituted a moderate living would be an impermissible infringement upon the tribal right to self-government. Second, I am not convinced that the state is entitled to regulate to enforce an upper limit on treaty uses rather than to ensure a minimum take for treaty harvesters. And finally, the state may regulate the exercise of off-reservation usufructuary rights as reasonable and necessary for conservation of a particular resource. It is not clear to me that this regulatory power will not protect adequately the state's interest in tribal adherence to the moderate living standard once allocation is necessary. Accordingly, I do not find that the state is entitled to regulate the tribes' treaty rights for the purpose of ensuring adherence to the moderate living standard.

### 5. Tribal Regulation

The last issue identified by the briefs concerns the tribes' regulation of their members' off-reservation usufructuary rights. The tribes assert, and the state does not dispute, the existence of a tribal right to regulate members in the exercise of their off-reservation rights. However, the parties do dispute the effect of tribal regulation upon the state's ability to regulate tribal activity.

■ As an initial matter, I find that the plaintiff tribes possess the authority to regulate their members in the exercise of treaty usufructuary rights off the reservation. *Settler v. Lameer,* 507 F.2d 231, 237 (9th Cir.1974); *Washington,* 520 F.2d at 686; *United States v. State of Michigan,* 471 F.Supp. 192, 273 (W.D.Mich.1979). "The mere fact that the fishing may take place off the reservation does not make the regulation of treaty fishing any less an internal

matter. The locus of the act is not conclusive." *Settler,* 507 F.2d at 237. Moreover, the power to regulate necessarily includes the power to enforce the regulations against tribal members by arrest or other enforcement mechanisms. *Id.* at 238; *Washington,* 520 F.2d at 686 & n. 4.

■ I find as well that effective tribal self-regulation of a particular resource or activity precludes state regulation of that resource or activity as to the tribes. The state argues that tribal regulations cannot "preempt" the state, but rather that the two sovereigns enjoy concurrent jurisdiction to regulate the exercise of off-reservation treaty rights. The state is correct that "ordinarily the state and the tribe possess concurrent power to regulate Indian fishing" and hunting activities off the reservation. *Washington,* 520 F.2d at 686 n. 4; *see also Settler,* 507 F.2d at 237. However, where "the tribes responsibly insure" that conservation and public safety and health goals are met, the legitimate interests of the state are not contravened. *Washington,* 520 F.2d at 686. *See also* Reynolds, *Indian Hunting and Fishing Rights,* 62 N.C.L.Rev. at 770 ("if a tribe can show that it adequately is regulating its members to ensure perpetuation of the resource, state regulation will not be deemed necessary.").

Courts have indicated that it is within the equitable discretion of the district court to determine "that qualified tribes should have the power, subject to certain conditions, to regulate their own members in the interest of conservation free of state controls." *Washington,* 520 F.2d at 686 & n. 4, and the description of the qualifications and conditions imposed by the district court, *Washington,* 384 F.Supp. at 340–42. *See also Michigan,* 653 F.2d at 279 (state may regulate only in "the absence of effective Indian tribal self-regulation").

Tribal regulation of usufructuary rights and activities does not "preempt" state regulation in the sense that federal regulation might. The mere existence of a federal regulation might occupy the field to the exclusion of state regulation, even if the

federal regulation is neither effective nor enforced. Here, by contrast, the plaintiff tribes may regulate their members exclusive of state regulation so long as the tribal self-regulation is effective. Upon a showing that tribal regulation of Indian usufructuary rights and activities is ineffective, state regulations in accordance with the standards set forth in this opinion will be sanctioned.

What constitutes effective tribal regulation must wait until the parties have had the opportunity to brief the question. However, I will indicate my preliminary understanding of the broad outlines. While the tribes may regulate their members' usufructuary activities for any legitimate purpose, for the purpose of preclusion of state regulation, tribal regulations must adequately address legitimate state concerns in the areas of conservation of resources and public health and safety. There must be effective enforcement mechanisms, including competent and adequately trained enforcement personnel. There must be a form of official tribal identification for tribe members exercising off-reservation rights. And there must be a full exchange of relevant information between the plaintiff tribes and the state, including the exchange of scientific and management information as well as data on the harvest of any given resource in any given geographic area. Cooperation among the Department of Natural Resources, the tribes, and perhaps the Great Lakes Indian Fish and Wildlife Commission will help to ensure the full exchange of information necessary to the common state and tribal goals of preserving the resource and ensuring public health and safety. If necessary, however, I will consider an order directing the establishment of a joint tribal-state natural resources commission.

ORDER

IT IS ORDERED that the state may regulate the exercise of the plaintiff tribes' off-reservation usufructuary rights in the interest of conservation and in the interest of public health and safety, in accordance with the applicable standards set forth in this opinion. The state may not regulate in the interest of any other purpose. The state's request for a ruling that it may regulate to ensure tribal adherence to a moderate living standard is denied.

IT IS ORDERED further that effective tribal self-regulation of the plaintiff tribes' members in the exercise of their off-reservation rights precludes concurrent state regulation. The development of a precise standard for determining when tribal regulation is effective will await further briefing by the parties. Accordingly, the following briefing schedule is established. The plaintiff tribes may have until September 14, 1987 to serve and file a brief setting forth their definition of the appropriate standard, and any documentary evidence they wish to present. The state may then have until October 5, 1987 to serve and file a brief setting forth its response to the tribes and any documentary evidence it wishes to present. The tribes may then have until October 19, 1987 to file a reply brief.